(No. 61368.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v. DONALD LANG, Appellee.

*Opinion filed October 1, 1986.*

Richard M. Daley, State's Attorney, of Chicago (Jane Clark Casey, Henry A. Hauser, Mark R. Davis and Marcia Maras, Assistant State's Attorneys, of counsel), for the People.

James J. Doherty, Public Defender, of Chicago (Marilyn Martin, Assistant Public Defender, of counsel), for appellee.

JUSTICE MORAN delivered the opinion of the court:

Respondent, Donald Lang, is a 41-year-old, visually impaired, deaf mute. He was never taught to read or write, and for most of his life he has had virtually no ability to communicate with other people in any recognized language system. However, in recent years respondent has attained a limited ability to communicate in sign language, and he continues to receive sign-language instruction on a regular basis.

In March 1981, the circuit court of Cook County found respondent unfit to stand trial for the 1971 murder of a woman. The court also determined that no substantial probability existed that respondent would obtain

fitness within one year. Thereafter, the State sought to obtain respondent's involuntary admission to the Department of Mental Health and Developmental Disabilities (Department). The State's request for an involuntary-commitment hearing was granted. The circuit court, in accordance with State statute, dismissed the murder charge with leave to reinstate. Ill. Rev. Stat. 1981, ch. 38, par. 104—23(b)(3).

A hearing was held in May 1981, to determine if respondent was a person subject to involuntary admission under the provisions of the Mental Health and Developmental Disabilities Code (Mental Health Code) (Ill. Rev. Stat. 1981, ch. 91½, par. 1—100 *et seq.*). Thereafter, on August 28, 1981, the circuit court found that respondent was a person subject to involuntary admission under section 1—119 of the Mental Health Code (Ill. Rev. Stat. 1981, ch. 91½, par. 1—119) and ordered that respondent be hospitalized in a mental-health facility designated by the Department. Subsequently, the circuit court, in accordance with the periodic-review provision of the Mental Health Code (see Ill. Rev. Stat. 1985, ch. 91½, par. 3—813), has made nine redeterminations of respondent's involuntary-admission status. In each instance the court has concluded that respondent's condition continues to meet the criteria for involuntary admission under section 1—119. However, no redetermination has been made concerning respondent's fitness to stand trial for the 1971 murder.

Following the seventh hearing on respondent's involuntary-admission status, his attorneys petitioned the circuit court for a formal hearing into respondent's fitness to stand trial for murder. The petition was denied and respondent appealed. That appeal was subsequently consolidated by the appellate court with appeals from the third, fourth, sixth and seventh involuntary-admission hearings. The appellate court reversed the circuit court

in part, holding that respondent was entitled to a formal fitness hearing. However, it decided to "defer" consideration of the challenged hearings on involuntary admission in light of its resolution of the fitness issue. (127 Ill. App. 3d 313, 316.) We granted the State leave to appeal (94 Ill. 2d R. 315). Subsequently respondent filed notices of appeal from the eighth and ninth hearings on his involuntary-admission status, and we allowed respondent's motion to transfer those appeals to this court pursuant to Supreme Court Rule 302(b) (94 Ill. 2d R. 302(b)), and consolidated them with the previously filed appeals in this matter.

At issue is whether the trial court erred in refusing to grant respondent a new fitness hearing. Additionally, respondent contends: (1) that the term "mentally ill" in section 1—119 of the Mental Health Code (Ill. Rev. Stat. 1985, ch. 91½, par. 1—119) is unconstitutionally vague; (2) that the State failed to present clear and convincing proof that respondent was a person subject to involuntary admission under section 1—119; (3) that this court's standard equating mental illness with "unfitness not due to solely a physical condition" violates the due process and equal protection clauses of the Federal and Illinois constitutions; (4) that the orders for involuntary admission entered after the sixth, seventh, eighth and ninth commitment hearings must be reversed because they were based on inadmissible evidence; (5) that certain testimony at the ninth hearing on involuntary admission should have been stricken because the State violated applicable discovery provisions; (6) that the murder indictment against respondent must be dismissed because he was not provided a discharge hearing pursuant to section 104—23(a) of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1985, ch. 38, par. 104—23(a)); and (7) that the trial court impermissibly relied upon evidence that others react negatively to respondent in find-

ing that respondent is dangerous to himself and others.

The events of respondent's case prior to 1979 are described in previous opinions of this court (see *People v. Lang* (1979), 76 Ill. 2d 311; *People ex rel. Myers v. Briggs* (1970), 46 Ill. 2d 281; *People v. Lang* (1967), 37 Ill. 2d 75) and will not be repeated here. We also note that no appeals were taken from the orders of involuntary admission entered following the first, second and fifth commitment hearings. Respondent filed a notice of appeal from the order continuing his involuntary-admission status following the 10th commitment hearing, and a transcript of that hearing was filed in this court. However, no motion was made to transfer that appeal from the appellate court to this court. As such, the record from the 10th hearing is not a part of the record in the case before this court, and it will not be considered. Finally, we note that, because of the number of appellate cases and the voluminous record, it is impractical to set forth all of the evidence in the record. The following is a summary of the relevant facts needed to resolve the issues raised in this appeal.

The initial hearing on respondent's involuntary-admission status was held in May 1981. At that hearing the court heard testimony from five psychologists, three psychiatrists, a social worker, and Julius Lang, respondent's older brother and conservator. Correctional officers and staff from the Cook County department of corrections, where respondent had previously been held, also testified. Thereafter, on August 28, 1981, the court found respondent to be a person subject to involuntary admission, and it ordered that respondent be hospitalized in a mental-health facility designated by the Department. Respondent was placed at the Manteno Mental Health Center in Manteno, Illinois. Subsequently, the State, as required by statute, petitioned the court to continue respondent's involuntary-admission status. A hearing

was held on the State's petition for involuntary admission, and to review the treatment plan submitted by the Department for respondent. On November 6, 1981, the court found that respondent continued to meet the criteria for involuntary admission. The court also ordered that respondent's treatment plan include formal instruction in sign language, mathematics and reading; vocational training; and increased involvement with persons who communicate in sign language. The court found that the successful implementation of the treatment plan required respondent's transfer from Manteno to a Chicago facility. Thereafter, on December 3, 1981, respondent was transferred by the Department to its Chicago-Read Mental Health Center (Chicago-Read).

For purposes of the third hearing on involuntary admission held on January 21, 1982 (Ill. App. 1st Dist. No. 82—429), the parties stipulated that the testimony of Drs. McCay Vernon and Albert Stipes would be identical to that given at the initial hearing on involuntary admission held in May 1981. Both doctors had testified for the State. In addition to the stipulated testimony, Drs. Gregory Szcerbinauk and John Mitchell testified on behalf of the State, and Dr. Robert Donoghue testified on behalf of respondent.

Dr. Vernon, a psychologist and professor at Western Maryland College, testified that he was experienced in performing psychological evaluation of deaf persons with limited or no ability to communicate, and estimated that he conducted five to 10 such evaluations a year. His evaluation of respondent included the review of existing reports from psychiatrists and psychologists, the review of two psychological histories, and interviews with correctional officers and staff who supervised respondent at the Cook County department of corrections. In addition, Dr. Vernon spent six hours examining and testing respondent. He administered portions of the Wechsler test

for children-adolescents, the Leiter International performance scale, the Draw-a-Person test, and the Thematic Apperception test. He also gave respondent a plastic model truck, which he requested respondent to assemble. He stated that respondent did not make a "full commitment" to the tests but was "totally committed" to assembling the model truck. Based on his testing and observations, Dr. Vernon concluded that respondent had at least a 90 to 100 I.Q., and that "relative to I.Q. he [respondent] cannot be called retarded."

Dr. Vernon diagnosed respondent as suffering from the mental disorder primitive personality, which is also known as surdophrenia. Dr. Vernon explained that the diagnosis of surdophrenia or primitive personality is unique to deaf people and has the following basic characteristics: normal or near normal intelligence; almost total absence of language development; and social information and knowledge are childlike, with major gaps in certain areas where there is good knowledge. On cross-examination Dr. Vernon conceded that the diagnosis of primitive personality does not appear in the Diagnostic and Statistical Manual of Mental Disorders-III (DSM-III) drafted by the American Psychiatric Association. He stated that respondent's condition was "unique" and that the drafters of the DSM-III "had never seen a person like" respondent. As such, Dr. Vernon believed it unwise to "wedge [respondent] into some existing DSM[-III] definition." Dr. Vernon testified that his diagnosis of primitive personality was supported by the fact of respondent's lack of language development and the fact that respondent has "a significant impairment of functioning in major areas," such as his interactions with other people, and his lack of understanding of many of the rules of society. He testified that respondent had "far more additional difficulties" than most deaf people, explaining that most deaf people, unlike respondent, knew sign lan-

guage, had at least a third- or fourth-grade reading level, and had learned "the rules of society" through interaction with their deaf peers. Asked by the court whether respondent "perceives the world in a way quite differently than most deaf persons," Dr. Vernon replied, "Traumatically differently."

Dr. Vernon also opined that because of respondent's mental illness, he could reasonably be expected to inflict serious harm on another person. His prediction of dangerousness was premised upon evidence that respondent may have committed two homicides and the fact that respondent did not have the "tools to cope" in society. He testified:

> "[W]hen you put a person out into society with as few tools to cope as Mr. Lang has, it's inevitable he's going to be exploited; it's inevitable he is not going to understand many of the things that happen to him; it's inevitable *** [b]ecause [when] he doesn't understand what's happened he's going to be suspicious. That when he doesn't get what he wants, he's not going to understand why. He's going to get angry. And these are factors just within Mr. Lang's psychodynamics that would increase the probability of some kind of vile acts on somebody else."

Dr. Vernon also testified that because of respondent's lack of "coping skills" he would be unable to care for his basic needs, such as holding a job, managing money, making purchases and relating to other people. He noted that respondent had "a very primitive understanding of right from wrong." Dr. Vernon recommended that respondent be placed in a "rehabilitative setting" with 24-hour supervision and an opportunity to interact with other deaf people. He also recommended that respondent receive instruction in sign language, reading, writing, and survival skills, and that he receive some kind of vocational training.

Dr. Stipes, a psychiatrist, evaluated respondent over

a three-day period in June 1980. His examination included personal observation of respondent, interviews with personnel at the Cook County department of corrections, and review of previous psychological evaluations. A clinical psychologist administered the Wechsler test, the Revised Beta I.Q. test, the Bender gestalt test, portions of the Standard-Binet test, and some "projective drawings" to respondent at Dr. Stipes' direction. Dr. Stipes' diagnosis was mild mental retardation, mixed personality disorder, and prelingual deafness. Dr. Stipes testified that respondent "thinks in such a concrete way." He believed that respondent "needs constant supervision" and "to have other people anticipate his needs." He opined that respondent could be expected to inflict harm on others and that respondent would be unable to guard himself against serious physical harm if allowed to leave a hospital setting. Dr. Stipes' opinion as to respondent's dangerousness and inability to cope in the community was based on several factors, including respondent's inability to communicate, his low frustration tolerance, his lack of understanding in social situations, and information on respondent's past history.

Dr. Szcerbinauk, a psychiatrist at Chicago-Read, interviewed respondent on January 6, 1982, and reviewed respondent's records. Dr. Szcerbinauk concluded that respondent was not psychotic or retarded, but he agreed with Dr. Vernon's diagnosis of primitive personality or surdophrenia. He observed that respondent "becomes angry and frustrated when his needs are not met immediately" or when he does not understand a particular message. In those situations respondent occasionally became "upset and aggressive." For example, Dr. Szcerbinauk said an incident was reported at Chicago-Read where respondent expressed a desire to go outside. When he was told to wait, respondent grabbed a female technician. He was subsequently removed and given

emergency sedation. Dr. Szcerbinauk was of the opinion that respondent could inflict harm on others, and expose himself "to harm indirectly by provoking or putting other people into aggressive moods to defend themselves." He also believed that respondent was unable to care for himself.

Dr. Mitchell, a clinical psychologist at Chicago-Read, also agreed with the diagnosis of primitive personality. He testified that respondent had a low tolerance for delayed gratification and was easily frustrated. He stated that he was aware of an incident at Chicago-Read where respondent shook his fist at a staff member, and another incident where respondent twisted the arm of a female employee. The employee was not hurt. In addition respondent had not struck or inflicted serious injury on anyone since coming to Chicago-Read. Dr. Mitchell observed that respondent presented a "variated picture," remarking that respondent "can be playful and express concern about other people." He was of the opinion that if respondent were released into the community he could reasonably be expected to inflict injury on others. His opinion was based on the fact that respondent became "explosive" and angry when people misunderstood him, or when he misunderstood a particular situation.

Dr. Donoghue, a psychologist with a doctorate degree in the psychology of the deaf, testified on behalf of the respondent. Dr. Donoghue, who is deaf, began tutoring respondent in sign language prior to the initial involuntary-admission proceedings in 1981, and was subsequently hired by the Department to supervise respondent's educational program. He testified that it was his opinion that respondent was not mentally ill or mentally retarded. He stated that respondent was being tutored in sign language five days a week, and that respondent looked forward to his lessons. Respondent was using some language and was "progressing well" according to

Dr. Donoghue. He also remarked that respondent was benefiting from the court-ordered hospitalization, and stated that he hoped it continued. Based on the stipulation and testimony, the circuit court on January 22, 1982, found that respondent continued to be a person subject to involuntary admission, and ordered that his treatment at Chicago-Read continue.

Appellate cause No. 82—2302 is an appeal from the order of August 11, 1982, finding that respondent continued to be a person subject to involuntary admission (fourth hearing on involuntary admission). The record in that case shows that a petition to continue respondent's involuntary-admission status was filed by the State on July 21, 1982. The petition was accompanied by the certificate of Dr. John Mitchell, and the certificate of Dr. G. Justinano, a psychiatrist at Chicago-Read. The parties stipulated for purposes of the hearing that if the doctors were called to testify, their testimony would be identical to that contained in their certificates. Both doctors were of the opinion that respondent continued to be mentally ill and because of his illness was likely to inflict serious physical harm on others. Dr. Mitchell's certificate noted that respondent had made "significant improvement in toleration of frustration and willingness to use sign language." However, it stated that "minor incidents continue" and "in an open and poorly structured environment these incidents could have been major." It was also stipulated that Maureen Resheske, a social worker and respondent's treatment coordinator, would testify that respondent was involved in a physical altercation with his roommate on April 23, 1982, over the latter's unwillingness to make his bed and clean up his area. A security officer intervened and stopped the fight. It also was reported that on May 10, 1982, respondent shoved an elderly man after respondent had politely escorted the man out of a classroom several times while sign-lan-

guage classes were in progress. When the man's age and "confused" condition were explained, respondent became cooperative and resumed his lessons.

The court, in accordance with a stipulation of the parties, also considered testimony given by Dr. McCay Vernon on April 7, 1982. The April 7 testimony concerned respondent's treatment plan. Dr. Vernon testified that his previous diagnosis of primitive personality was reinforced by the recent medical findings that respondent suffered from glaucoma in the left eye and from an eye disease known as "salt and pepper retinopathy." Both medical conditions were indicative of prenatal rubella, and that this discovery made the "whole clinical picture *** more easy to understand." He explained that rubella deaf are more likely than the general deaf population to exhibit behavior problems such as excitability, explosiveness, and hyperactivity, and cognitive disorders like memory problems, sequencing problems, and problems learning language. Rubella-deaf persons also often have cataracts and heart murmurs. Dr. Vernon observed that respondent "responds with greater excitability to stress and frustration than most persons." He also noted that respondent had memory problems, and exhibited letter reversals in his writing—both indicative of prenatal rubella. On cross-examination, he testified that there was no evidence of a heart murmur or cataracts in respondent's medical history. Dr. Vernon stated that his previous opinion as to respondent's dangerousness was reinforced by a recent incident at Chicago-Read in which respondent twisted the arm of a nurse and "the fairly frequent need there to call in security." Dr. Vernon also questioned respondent's ability to take care of himself "out of a protected environment" in light of respondent's refusal to take his eye medication. Despite attempts by the staff to communicate to him that the eye drops "are all that stands between him and his losing his

eye," refusing eye medication has been "one of his ways of resisting authority." He recommended that treatment at Chicago-Read continue.

Appellate cause No. 83—2218 is an appeal from an order of August 24, 1983, finding respondent to be a person subject to involuntary admission (sixth hearing on involuntary admission). At that hearing the parties stipulated that Dr. Vernon's testimony would be identical to his previously described testimony of April 7, 1982. The parties also stipulated that Maureen Resheske's testimony would be substantially identical to the statements contained in the petition for involuntary admission filed August 11, 1983. The petition stated that on May 22, 1983, respondent kissed the ear of a female patient. She refused his advances, but respondent persisted. A second female patient requested respondent to stop. He became angry, grabbed the second patient's arm, and bent it behind her back. Staff and security intervened, and no one was injured. The petition also stated that on June 14, 1983, respondent refused to get ready to go to an eye appointment or to take his medication. After much coaxing, respondent received his medication and left voluntarily for the appointment. On July 6, 1983, it was reported that respondent was in the possession of a master key to Chicago-Read, a solid steel rod, a florescent light, and another set of keys. The keys had been reported missing a month earlier by a nurse. The comprehensive examination and social investigation, filed with the petition, noted that respondent underwent surgery on March 3, 1983, and April 6, 1983, for a detached retina to the left eye. The report stated that respondent is legally blind in the left eye and suffers from glaucoma and rubella retinopathy. Seven different medications were prescribed for his eye condition.

Dr. John Mitchell, who had previously testified as to respondent's condition, was called to testify by the

State. Dr. Mitchell noted that he saw respondent on a regular basis, participated in biweekly staff meetings on respondent's case, and reviewed the most recent medical records on respondent. He testified that his previous diagnosis of primitive personality or surdophrenia had not changed. However, on cross-examination he conceded that the diagnosis of primitive personality was not listed on the certificate he prepared in conjunction with the petition for involuntary admission. The doctor said he believed that, because of respondent's mental illness, respondent continued to be a danger to himself and others and was unable to care for himself outside of the hospital. He noted that respondent sometimes balked at taking his eye medication, which endangered his eyesight. He believed that the recent incidents described by Resheske in the petition supported his opinion that respondent continued to be dangerous.

Appellate cause No. 84—1238 is an appeal from an order of April 25, 1984, finding that respondent continued to be a person subject to involuntary admission (seventh hearing on involuntary admission). The sole witness for the State was Dr. John Mitchell. He stated that his diagnosis continued to be primitive personality, along with the diagnosis of atypical personality disorder. Dr. Mitchell believed that respondent continued to be dangerous, and was of the further opinion that respondent was unable to care for his basic needs so as to guard himself from harm. Dr. Mitchell testified that his opinion with regard to respondent's dangerousness was supported by recent incidents contained in the hospital records. He observed that one report stated that respondent had intervened in a fight between two other patients. After being scratched or slapped by one of the patients involved in the fight, respondent struck her in the mouth, knocking her to the floor. The patient lost "two or three teeth." It also was reported that respond-

ent grabbed a patient who walked by his room. Staff intervened immediately and no one was injured. Dr. Mitchell also testified that respondent refused to take his eye medication whenever "something displeases him" and risks losing his eyesight if he does not take the medication. He opined that respondent would not take his eye medication as prescribed if released into the community.

The court also allowed Dr. Donoghue to testify on behalf of the conservator concerning respondent's condition and progress. He described respondent's educational program. The doctor noted that the formal education program included instruction in sign language, finger spelling, reading, handwriting, how to tell time, and arithmetic. Respondent was "not very good at memorizing things," and part of the training included attempts to improve respondent's ability to memorize. As part of his informal training, respondent participated in a deaf bowling league and other activities sponsored by deaf clubs and organizations. Respondent was always accompanied on the outings by Dr. Donoghue or one of the tutors. Dr. Donoghue stated that the social activities reinforced the formal training by allowing respondent to use sign language with other deaf people. He opined that respondent had made excellent progress over the past two years considering respondent's age and lack of previous education or training. He stated that respondent was now able to communicate "at a concrete level" but opined that respondent was not yet fit to stand trial for murder. In addition to commenting on respondent's educational progress, the doctor testified that respondent has "some problems controlling himself." He explained that respondent sometimes used poor judgment by physically intervening in fights and altercations between other people. Dr. Donoghue also expressed concern that if respondent left Chicago-Read, "he will skip the [eye] medication and become completely blind." He recommended

that respondent continue to be hospitalized and that his treatment program continue.

Appellate cause No. 84—2837 is an appeal from a November 15, 1984, order finding that respondent continued to meet the criteria for involuntary admission (eighth hearing on involuntary admission). The following evidence was introduced at the hearing. ·

Respondent's treatment coordinator, Maureen Resheske, testified that on September 27, 1984, respondent was transferred to Durso II, a new unit for deaf patients at Chicago-Read. He continued to receive the same educational, workshop, and off-grounds social programs at Durso II. However, Resheske stated that Durso II was more restricted than respondent's old unit, and he was "required to follow the rules more stringently." She noted that since respondent was now one of many hearing-impaired patients on the unit, instead of the only deaf patient, he was not treated by the staff as "special" anymore. Respondent was not allowed to "verbalize as he did before," and he was encouraged to use sign language with the staff. She testified that, because of the new restrictions and requirements at Durso II, respondent's behavior was sometimes "stubborn." She noted that respondent had refused his eye medication on occasion and had become angry at staff members over some of the restrictions.

Mary Johnson, a mental-health technician at Chicago-Read, testified that she went to respondent's room at approximately 7:30 a.m. on October 18, 1984. She was accompanied by Eddie Thomas, Jr., a security officer. Johnson touched respondent in an attempt to wake him and motioned that it was time to get up. Respondent "waved her away," and several more attempts were made to wake him. Eventually respondent sat up on the bed, and Johnson began to change the linen. Respondent then stood on the bed and lunged for Johnson's throat.

She stepped back, and respondent was restrained by Thomas. Johnson was unhurt, and she testified that respondent did not actually touch her. She testified on cross-examination that respondent had been allowed to sleep as long as he wanted prior to being transferred to the Durso Unit. Later that morning Johnson noticed that respondent had been placed in leather restraints.

Johnson's testimony regarding the events in respondent's room on October 18 was corroborated by Thomas. He further testified that later that day respondent attempted to burn Thomas with a lit cigarette, when the latter tried to take the cigarette away. Respondent's smoking privileges had been suspended because of the incident earlier that morning involving Johnson. Security officer David Strickland testified that he prevented a physical altercation between respondent and another patient on September 13, 1984. Both patients were "yelling and screaming" and advancing toward each other. He said respondent had a clenched fist and had to be physically restrained. On cross-examination, he testified that he did not know how the incident started.

Dr. John Mitchell also testified for the State. The doctor's testimony was substantially similar to his testimony in previous hearings. He believed respondent was a primitive personality, which he opined was a mental illness. He described the illness' characteristics as including occasional poor impulse control, occasional difficulty in adapting to new situations, absence of mental retardation, and lack of development of certain abstract ideas. He doubted respondent would take his eye medication "if left to his own devices." Dr. Mitchell also doubted respondent could budget his money. The doctor testified that because of respondent's inability to communicate his needs and wants to others "he might become frustrated or he might become prey to someone who wanted to take advantage of him." He recommended that respond-

ent's treatment continue at the Durso II unit.

The State also called Dr. Richard Ney, a clinical psychologist at Chicago-Read. The doctor attempted to examine respondent on October 18, 1984. At the time respondent was in restraints. For purposes of the examination, respondent's hands were removed from the restraints, and Dr. Ney tried to communicate with him with the aid of a sign-language interpreter. However, respondent would not look at the interpreter and refused to cooperate in the examination. Dr. Ney also read previous psychological examinations, interviewed staff at Chicago-Read, and reviewed respondent's hospital records. Dr. Ney concluded that respondent suffered from "antisocial personality disorder," a mental disorder listed in the DSM-III. The diagnosis of antisocial-personality disorder requires a history of at least three of 12 traits before age 15: truancy, expulsion or suspension from school for misbehavior, delinquency (arrested or referred to juvenile court because of behavior), running away from home overnight at least twice, persistent lying, repeated sexual intercourse in a casual relationship, repeated drunkenness or substance abuse, thefts, vandalism, school grades markedly below expectations, chronic violations of rules at home or school (other than truancy), and initiation of fights. Dr. Ney testified that his diagnosis of antisocial-personality disorder was supported by evidence in respondent's records of "truancy," "delinquency," and "grades markedly below expectations." However, he conceded on cross-examination that he was unsure whether respondent had a history of delinquency before age 15. He also stated that his opinion as to respondent's "truancy" would change if the reason for respondent's absence from school was that he was expelled for fecal incontinence. Dr. Ney admitted that none of the 12 characteristics listed for antisocial-personality disorder in the DSM-III clearly applied to respond-

ent. He said, however, that he did not "rule out" the diagnosis of primitive personality. Dr. Ney believed respondent posed a danger because of his "unpredictable aggressive behavior." He also was of the opinion that respondent could endanger himself by "provoking others to attack him."

The State's final witness was Dr. Robert Donoghue. Asked whether respondent was mentally ill, the doctor replied that he was "very loath to call anyone mentally ill." He remarked further that respondent "was pretty close to normal" but that he "displays some traits, some characteristics that would classify him as mentally ill" under the DSM-III. Dr. Donoghue was of the opinion that respondent had an "attention deficit," a "conduct disorder problem," and "oppositional tendencies." Dr. Donoghue opined that respondent was a danger to himself and others because "as long as he doesn't learn enough communication, as long as he doesn't learn to control himself, there is a danger of misunderstanding." He also believed that respondent was unable to care for his basic needs because he was "very unreliable" in terms of taking his eye medication. Dr. Donoghue was of the opinion that respondent's refusal to take his medication was attributable to his mental illness:

> "Sometimes he uses his eye medication to manipulate staff into doing something and that is something that bothers me that he uses something he knows he has to take to get another advantage for himself. I think that is not realistic thinking.
>
> * * *
>
> But in the hospital he uses his medication as a way to manipulate people. He throws a temper tantrum, which is typical of people who have oppositional tendencies or if he's being stubborn, another trait of an oppositional tendency. He will refuse his medication. He won't take it. He'll give the staff a hard time.
>
> I wonder if his thinking is really unbased because he

only has one functioning eye and he knows he can lose that eye. So, I don't think trying to manipulate staff is a healthy sign, at the extent of his eyesight. *** I'm worried if he goes out, if he's released and goes out that he will neglect his medication, take them whenever he feels like it, and loses [*sic*] his eyesight. He has only one eye functioning and that one is not in good shape."

Dr. Donoghue recommended that treatment continue at Durso II.

No witnesses were called to testify by respondent.

Appellate cause No. 85—2528 is an appeal from an order of June 25, 1985, finding that respondent continued to be a person subject to involuntary admission (ninth hearing on involuntary admission). At the hearing 10 witnesses testified for the State. Respondent called no witnesses.

The State presented several witnesses who testified concerning defendant's conduct since the previous order of commitment on November 15, 1984. A security officer testified that on April 22, 1985, respondent knocked a cup of coffee belonging to a female patient off a table after she refused to light his cigarette. Additionally, a nurse technician, Yelena Rumyantseva, related that on March 10, 1985, respondent pushed her against a wall and twisted her wrist after she requested in sign language that he stop smoking in a nonsmoking area. She also related that respondent refused his eye medication the following morning, and pushed another nurse. When Rumyantseva informed respondent that he could not leave the nurses' station until he received his medication, he grabbed her arm and twisted it behind her back. Security intervened and respondent was given a sedative. Cynthia Wachter, an activities therapist, testified that on May 28, 1985, she alerted security to the fact that respondent was alone in the nursing area. As the officer escorted respondent back to the nonrestricted area,

Wachter testified that respondent shook his finger in her face and was "verbalizing." She related that suddenly respondent grabbed her neck with one hand, pushing her head against a door. He was quickly subdued by security.

Deeadrn Morrison, one of respondent's tutors, related that on December 20, 1984, respondent took one of her files during a tutoring session and refused to return it. After a security officer intervened and the file was retrieved, respondent became angry, knocked over a blackboard in the room, and ordered Morrison to leave. She left the room and walked to a nurses' station. While she was still at the nurses' station preparing a report, respondent approached the station and asked a nurse for permission to get a cup of coffee. Morrison directed the nurse to refuse permission, citing respondent's misbehavior as the reason. She explained that it was the policy of Durso II to suspend privileges for misbehavior. Respondent became angry, grabbed Morrison by the coat, and picked her up off the floor. A nearby security officer grabbed respondent by the collar and escorted him into the hallway. Morrison testified on cross-examination that she was not afraid of respondent.

Respondent's treatment coordinator, Maureen Resheske, testified that respondent's refusal to take his medication had become less frequent in recent months. However, she observed that he "will become upset or he will get angry about something or someone and then refuses medications." She estimated that respondent refused his medication once or twice a week.

Dr. Richard Ney, who testified previously at the eighth commitment hearing, diagnosed respondent as suffering from "atypical impulse control disorder," "atypical pervasive developmental disorder," and "atypical personality disorder." All three diagnoses are listed in the DSM-III. Dr. Ney noted that the diagnoses differed from his previous diagnosis of respondent as an

antisocial personality. According to Ney the change in diagnosis resulted from a greater opportunity to observe respondent. He stated that in recent months he had developed a stronger relationship with respondent, and also had a greater opportunity to review more data on respondent's case.

Dr. Ney's diagnosis of atypical-impulse-control disorder was based on "observations that there have been intermittent episodes of aggressive action on the part of" respondent. The doctor specifically noted the incidents testified to where respondent had grabbed or twisted nurses' arms. He explained that atypical-impulse-control disorder was a "residual category" which does not meet all the criteria for any one specific impulse-control disorder. He remarked that the disorder did not manifest itself all the time, noting that there are "periods when there is just no evidence of it at all, and then these discrete periods in which it seems to occur." Dr. Ney testified that "typically an impulse control disorder is seen as a function of multiple handicaps." He believed "fewer episodes of acting out" would occur as a person became better able to express his emotions.

Dr. Ney's second diagnosis, "atypical pervasive developmental disorder," usually developed in childhood. According to Dr. Ney, persons suffering from the disorder tended to be "very rigid in how they organize their environment" and had great difficulty in accepting change. He noted that other symptoms of the disorder are "low frustration tolerance," "inappropriate or constricted affect," and "unexplained rage reactions." The disorder in respondent's case, according to Ney, was in a "residual state," meaning that the full disorder was no longer present. The third diagnosis offered by Dr. Ney was "atypical personality disorder." He explained that respondent had some, but not all, of the symptoms for the paranoid, antisocial and narcissistic personality disor-

ders. He observed that respondent's "suspiciousness and wariness of others" was characteristic of the paranoid personality disorder, and that his aggression toward others was a symptom of an antisocial personality. He also stated that respondent had "an inflated sense of self-importance and a belief that others understood" his attempts to communicate, and that these were characteristics of the narcissistic personality disorder. Dr. Ney's final diagnosis was "borderline intellectual functioning." This diagnosis was based on respondent's score on the performance section of the Wechsler Adult Intelligence Scale-Revised test, which had been administered for the purposes of the hearing. Ney admitted, however, that respondent had difficulty in understanding some of the test instructions, and conceded that this inability to understand instructions "does call into question whether it [the score] is really that low."

It was Ney's opinion that respondent was likely to inflict serious physical harm on others because of his atypical-impulse-control disorder. He opined that respondent's behavior was unpredictable and it was difficult to know "what situations will frustrate him" and when he will "lash out at someone." However, he stated that respondent was less likely to harm someone he knows. Dr. Ney also believed that respondent was unable to care for his basic needs, opining that respondent "seems to have difficulty in planning for the future" and "making appropriate decisions especially with regard to his deteriorating eye condition."

Dr. Bernard Green, a psychologist at the speech and hearing center of Michael Reese Hospital in Chicago, testified that his primary diagnoses were borderline intelligence and probable neurological impairment—organic brain syndrome. His diagnosis of borderline intelligence was based on the test results administered under the direction of Dr. Ney. According to Dr. Green, persons with

borderline intelligence had I.Q. scores between 70 and 79. He viewed the results of the recent tests as indicating respondent's "present functioning" and not his potential. Moreover, he believed that respondent's performance on the tests was adversely affected by his hearing loss, inability to communicate, and his experiential and educational deprivation, making it "more difficult to accurately assess what his true potential is." Dr. Green also recommended that respondent undergo neuropsychological testing to determine whether he had a neurological impairment. The doctor opined that the "probability" of such impairment was indicated by respondent's difficulty in learning sign language, his difficulty in identifying simple words, and letter reversals in his writing. Dr. Green also stated that a number of factors strongly suggested that respondent suffered from a mental illness. He explained that respondent showed "marked difficulty in terms of impulse control," had problems "modulating his affect," and experienced difficulties in interpersonal relationships. According to Green, respondent showed signs of withdrawal, aggression and depression. He testified that his diagnosis was not incompatible with the diagnoses of Dr. Ney. Dr. Green testified that respondent was likely to inflict harm on others in an "unstructured setting" because of his low level of frustration tolerance, suspiciousness, and problems in modulating his affect. He recommended that hospitalization at Chicago-Read continue.

Dr. Susan Feder, a psychiatrist at both Chicago-Read and Michael Reese Hospital, testified that she had seen respondent on a weekly basis since September 28, 1984. The weekly meetings lasted from 5 to 30 minutes. She also reviewed respondent's records and interviewed staff at Chicago-Read. Dr. Feder agreed with Dr. Ney's diagnoses of "atypical impulse control disorder" and "atypical pervasive developmental disorder, residual state."

Her third diagnosis of "mixed personality disorder" was described as including some, but not all, of the traits of the borderline, narcissistic, antisocial, and paranoid personality disorders. The traits of borderline personality exhibited by respondent were intense swings in relationships, moods and self-esteem. A narcissistic characteristic was respondent's "inappropriate assessment of his communication skills." Traits of an antisocial personality were reports of theft and his failure to follow rules at Chicago-Read. Dr. Feder also testified that respondent was guarded, suspicious and mistrustful of others—traits of the paranoid personality disorder.

Dr. Feder believed a "high risk" existed that respondent would inflict serious harm on others. Her reasons for concluding that respondent posed a danger were his inappropriate assessment of his communication skills, his low frustration tolerance, her opinion that he exhibited perseverative thinking, and his memory impairment. Dr. Feder opined that when respondent "cannot have his needs met or understand immediately, then he will act in an unpredictable fashion, and, at times aggressively." She believed that respondent was "very capable" of caring for his grooming and hygiene, but doubted he could meet his needs "in an unstructured environment, where he would have to ask instructions or directions." Dr. Feder also doubted that he would take his eye medication regularly if left to his own devices, and noted that failure to take the eye medication could cause respondent to lose sight in his one good eye.

The court also heard the testimony of Nancy Purdy, a treatment coordinator at Chicago-Read. Purdy, who has a master's degree in deaf education, testified that she is fluent in sign language. Purdy testified that she evaluated respondent's educational skills in March 1985. The Wide-Range Achievement test, which measures spelling, arithmetic and reading recognition, was administered to

respondent as part of the evaluation. According to Purdy, respondent performed poorly on the mathematics portion of the test where his score was "equivalent to a pre-schooler, eight months." Respondent was able to count to 10 and identify some numbers by holding up his fingers. She said he had difficulty identifying larger numbers. On the spelling portion of the test respondent was able to copy symbols and write his name accurately. However, he "had difficulty" spelling words. Purdy also testified that respondent had a receptive vocabulary (ability to understand) of about 900 signs, and she stated on cross-examination that his receptive vocabulary could be as high as 1,500 signs. She testified that respondent used and expressed between 150 and 200 signs frequently, but that some of the 150 to 200 signs in his expressive vocabulary were informal "home" signs developed by respondent. According to Purdy, persons typically have a larger receptive vocabulary than expressive vocabulary. She testified that respondent used his informal "home" signs more frequently than formal signs, even when he knew the formal sign equivalent to the "home" sign. According to Purdy, respondent "doesn't have connective language, he has a vocabulary mostly of nouns and some verbs," and she opined that respondent would not "acquire sufficient language and subtleties of language to stand trial in the foreseeable future."

The State's final witness was Dr. Robert Donoghue. The doctor observed that he had previously diagnosed respondent as suffering from a conduct disorder. He testified that he had "mixed feelings" about the diagnosis because while "there are times he [respondent] demonstrates traits that might be indicative of mental illness" he can sometimes be "perfectly normal." According to Donoghue, respondent sometimes exhibited explosive reactions, did not seem to relate well to people, and was

sometimes very unrealistic in his demands. All three traits, according to Donoghue, indicated mental illness. He opined, however, that respondent's "main problem" was that he had not reached the level of communication where he could generalize. Because of his limited ability to communicate, he sometimes would not "understand what's going on and becomes frustrated." The doctor believed respondent knew "a lot more" signs than the 900-sign estimate given by Nancy Purdy. He also disagreed with Purdy's opinion that respondent would not become fit to stand trial in the foreseeable future. He opined that respondent was making progress toward becoming fit. Dr. Donoghue further testified that he disagreed with the opinions of doctors Ney and Green concerning respondent's intelligence level. He believed that respondent was not retarded or borderline. Dr. Donoghue also questioned Dr. Green's diagnosis of organic brain syndrome, stating he found no evidence of such diagnosis. He also stated that it was his opinion that respondent did not suffer from clinical depression.

Dr. Donoghue was of the opinion that respondent could physically harm others in situations where he misinterpreted other people's intentions or was unable to adequately express his own sentiments. The doctor explained that in such situations respondent sometimes became frustrated and bad-tempered. Dr. Donoghue also believed that respondent could take care of most of his basic needs in that he could dress and wash himself, and buy food and clothing. Respondent also has some basic cooking skills. However, Dr. Donoghue expressed concern that respondent would not take his eye medication on a regular basis if he were allowed to leave the hospital.

First, we consider whether respondent is entitled to a formal hearing into his fitness to stand trial for murder. We note that, at least in a legal context, the issue of

whether respondent is fit to stand trial for murder is totally unrelated to the issue of whether he is subject to involuntary admission under the Mental Health Code. Fitness hearings and involuntary admission hearings are separate proceedings with different purposes.

The goals of civil commitment laws (involuntary admission) are to provide care and treatment to mentally ill persons who are unable to care for themselves, and to protect society from the dangerous mentally ill. See *In re Stephenson* (1977), 67 Ill. 2d 544, 554; Durham and La Fond, *The Empirical Consequences & Policy Implications of Broadening the Statutory Criteria for Civil Commitment*, 3 Yale L. & Pol'y Rev. 395 (1985); Myers, *Involuntary Civil Commitment of the Mentally Ill: A System In Need of Change*, 29 Vill. L. Rev. 367, 380 (1983); La Fond, *An Examination of the Purposes of Involuntary Civil Commitment*, 30 Buffalo L. Rev. 499 (1981).

In contrast, the purpose of a fitness hearing (see Ill. Rev. Stat. 1985, ch. 38, par. 104—16) is to determine whether an accused can participate in his defense and function at trial, since the trial of an unfit defendant violates due process (*Pate v. Robinson* (1966), 383 U.S. 375, 378, 15 L. Ed. 2d 815, 818, 86 S. Ct. 836, 838; *People v. Murphy* (1978), 72 Ill. 2d 421, 430). A defendant is unfit to stand trial or otherwise plead if, "because of his mental or physical condition, he is unable to understand the nature and purpose of the proceedings against him or to assist in his defense." (Ill. Rev. Stat. 1985, ch. 38, par. 104—10.) Thus, " '[f]itness speaks only to a person's ability to function within the context of trial.' [Citation.] It does not refer to sanity or competence in other areas. A defendant can be fit for trial although his mind may be otherwise unsound." (*People v. Murphy* (1978), 72 Ill. 2d 421, 432. See also *People v. Heral* (1976), 62 Ill. 2d 329, 336; *People v. Burson* (1957), 11 Ill. 2d 360, 369.) "There

are many prisoners who, although competent to stand trial, are mentally disturbed or defective and require psychiatric treatment." *Withers v. People* (1961), 23 Ill. 2d 131, 136.

It follows, therefore, that a finding that a person is mentally ill and subject to involuntary admission is not necessarily indicative of his fitness to stand trial. "Although commitment to an institution may indicate that the individual needs some form of psychiatric treatment, it does not follow that he lacks the mental capacity to stand trial." (*People v. Richeson* (1962), 24 Ill. 2d 182, 184.) A person can be mentally ill and dangerous, and still be able to understand the nature and purpose of the criminal proceedings against him, and to assist in his defense. *People v. Lang* (1979), 76 Ill. 2d 311, 327; *People v. Murphy* (1978), 72 Ill. 2d 421, 432-33.

The record here reveals that the circuit court found respondent to be unfit to stand trial on March 23, 1981. The State subsequently sought to obtain respondent's involuntary admission under the Mental Health Code. On August 28, 1981, respondent was found to be a person subject to involuntary admission. The circuit court, in accordance with statute, then dismissed the murder charge "with the leave to reinstate." (Ill. Rev. Stat. 1981, ch. 38, par. 104—23(b)(3).) Nine redeterminations have been made regarding respondent's involuntary-admission status. However, a hearing has not been held in more than five years to determine whether respondent continues to be unfit to stand trial.

The State contends that since it has not yet reinstated the 1971 murder charge, respondent is not entitled to a readjudication of his fitness to stand trial. The State construes section 104—23 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1985, ch. 38, par. 104—23) as precluding subsequent hearings into an accused's fitness to stand trial following an election by the

State to seek involuntary admission, and dismissal of the charge with the leave to reinstate. That section provides in relevant part:

"(b) If at any time the court determines that there is not a substantial probability that the defendant will become fit to stand trial or to plead within one year from the date of the original finding of unfitness *** the State shall request the court:

* * *

(3) To remand the defendant to the custody of the Department *** and order a hearing to be conducted pursuant to the *** [Mental Health Code]. If the defendant is committed to the Department *** pursuant to such hearing, the court having jurisdiction over the criminal matter shall dismiss the charges against the defendant, with the leave to reinstate. *** A former defendant so committed shall be treated in the same manner as any other civilly committed patient for all purposes including admission, selection of the place of treatment and the treatment modalities, entitlement to rights and privileges, transfer, and discharge. ***

(c) If the defendant is restored to fitness and the original charges against him are reinstated, the speedy trial provisions of section 103—5 shall commence to run." (Ill. Rev. Stat. 1985, ch. 38, pars. 104—23(b)(3), (c).)

The State contends that, as a "former defendant" under section 104—23(b)(3), respondent has no statutory right to have his fitness readjudicated. We disagree. Although section 104—23(b)(3) does not require subsequent fitness hearings once the State elects to proceed pursuant to that section, neither does it prohibit subsequent fitness hearings. Thus, we do not think that section 104—23(b)(3) is dispositive of the issue here. Rather, we agree with respondent that the issue is properly resolved by looking to general principles of due process.

Due process is concerned with the "deprivation of interests encompassed by the Fourteenth Amendment's

protection of liberty and property." (*Board of Regents v. Roth* (1972), 408 U.S. 564, 569, 33 L. Ed. 2d 548, 556, 92 S. Ct. 2701, 2705. See also *Bishop v. Wood* (1976), 426 U.S. 341, 48 L. Ed. 2d 684, 96 S. Ct. 2074.) Thus, our first inquiry is whether the denial of a new fitness hearing to respondent would implicate a liberty or property interest protected by the due process clause.

The dismissal of a criminal charge with leave to reinstate does not discharge a defendant from the indictment or terminate the proceedings against him, and prosecution of the charge may be reinstated on the State's motion. (*People v. Bryant* (1951), 409 Ill. 467, 470; *People v. Rodgers* (1982), 106 Ill. App. 3d 741, 745.) Thus, even though the charges are dismissed with leave to reinstate and the defendant is released from custody, the dormant charges still constitute a limitation on the accused's liberty. In holding that a similar procedure that allowed prosecutors to take a *"nolle prosequi* with leave"* violated a defendant's speedy trial rights, the Supreme Court in *Klopfer v. North Carolina* (1967), 386 U.S. 213, 18 L. Ed. 2d 1, 87 S. Ct. 988, noted:

> "[A defendant] is not relieved of the limitations placed upon his liberty by this prosecution merely because its suspension permits him to go 'whithersoever he will.' The pendency of the indictment may subject him to public scorn and deprive him of employment ***. By indefinitely prolonging this oppression, as well as the 'anxiety and concern accompanying public accusation,' the criminal procedure condoned in this case *** clearly denies the [defendant] the right to a speedy trial *** guaranteed to him by the Sixth Amendment of the Constitution of the United States." (386 U.S. 213, 221-22, 18 L. Ed. 2d 1, 7, 87 S. Ct. 988, 992-93.)

A distinction exists between *Klopfer* and the present case, however. The defendant in *Klopfer* was competent, whereas the respondent here was found to be unfit to stand trial. We believe that a defendant's unfitness tolls

any sixth amendment speedy trial concerns (see *United States v. DeLuca* (S.D.N.Y. 1981), 529 F. Supp. 351), since the conviction of an unfit defendant violates due process (*Pate v. Robinson* (1966), 383 U.S. 375, 378, 15 L. Ed. 2d 815, 818, 86 S. Ct. 836, 838).

However, the distinction between *Klopfer* and the present case disappears once a defendant's competency is restored and he is adjudged fit to stand trial. Indeed, the only asserted justification for dismissing the murder charge "with the leave to reinstate" is respondent's unfitness to stand trial. If respondent's competency to stand trial is restored, the State is no longer justified in preventing him from obtaining a trial on the dormant charge. As such, we cannot agree that respondent's right to a fitness hearing is contingent upon reinstatement of the murder charge by the State. If the readjudication of a defendant's fitness were contingent upon the State reinstating the charges, a real possibility would exist that a defendant could be placed under a "cloud of an unliquidated criminal charge" (*Klopfer v. North Carolina* (1967), 386 U.S. 213, 227, 18 L. Ed. 2d 1, 10, 87 S. Ct. 988, 995 (Harlan, J., concurring)) indefinitely and possibly long after the defendant became fit for trial. The focus of procedural due process is on the safeguards necessary to guard against erroneous deprivations of liberty or property. Here, we conclude that the guarantee of fundamental fairness inherent in the due process clause requires periodic review of respondent's fitness status, so as to determine if he is fit to stand trial, thereby ensuring that respondent's speedy trial rights are not violated.

In addition to subjecting respondent to public scorn (see *Klopfer v. North Carolina* (1967), 386 U.S. 213, 221-22, 18 L. Ed. 2d 1, 7, 87 S. Ct. 988, 992-93), the dormant criminal charge continues to have a profound effect on the quality of respondent's life. Despite at-

tempts by the Department to place respondent in a nursing home or other facility which is less restrictive than Chicago-Read, private facilities refuse to accept him because of his possible "forensic involvement." Thus, respondent has a substantial interest in clearing his name and record of an alleged murder for which he was indicted more than 15 years ago. More than five years have passed since respondent's fitness to stand trial was formally adjudicated. We hold, therefore, that he is entitled to a hearing into his fitness to stand trial for murder.

Any entitlement to subsequent fitness hearings will depend on the outcome of the hearing herein ordered. If respondent is found fit to stand trial, the circuit court shall set the matter for trial. (See Ill. Rev. Stat. 1985, ch. 38, par. 104—20(b).) If the court finds respondent to be unfit and further finds that no substantial probability exists that he will attain fitness within one year, the provisions of section 104—23 will still be applicable, and the charges will remain dismissed "with the leave to reinstate" provided respondent is civilly committed. In such case, respondent will be entitled to another hearing into his fitness status within one year from the last finding of unfitness. Thereafter, fitness hearings are to be held at least every 12 months, but may be held sooner in the discretion of the circuit court if the court finds that respondent is making faster progress toward becoming fit.

Next, we consider respondent's argument that he was denied his statutory right to a discharge hearing as set forth in sections 104—23(a) and 104—25 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat., 1980 Supp., ch. 38, pars. 104—23(a), 104—25). A discharge hearing, sometimes called an "innocent only" hearing, allows an unfit defendant, or his attorney, to test the sufficiency of the State's evidence of the crime with which the defend-

ant is charged. Failure of the State to prove the defendant guilty beyond a reasonable doubt results in the defendant's acquittal of the crime. If the State sustains its *burden of proof*, however, the defendant may be remanded for further treatment. *People v. Rink* (1983), 97 Ill. 2d 533, 537-38.

Respondent contends that the speedy-trial provisions of section 103—5 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1979, ch. 38, par. 103—5) were triggered when he filed a written motion for a discharge hearing on May 16, 1981. (See Ill. Rev. Stat., 1980 Supp., ch. 38, par. 104—23(a).) He argues that since the circuit court denied his request for a discharge hearing, the murder indictment must be dismissed. We disagree. In *People v. Lang* (1979), 76 Ill. 2d 311, an earlier opinion involving this respondent, the court discussed at length respondent's right to a discharge hearing. The court in *Lang* concluded:

> "In our case, Lang has been tried for the murder charge and found guilty by a jury. Although the appellate court reversed the conviction as a violation of due process of law because of Lang's apparent unfitness, nonetheless, the trial afforded an opportunity to determine from the evidence whether or not he should be released as an innocent person. [Citation.] Thus the due process issue inherent in holding pending charges indefinitely over one who will not have a chance to prove his innocence is not present in this case." (76 Ill. 2d 311, 330.)

Thus, as the appellate court observed, the court in *Lang* held that respondent's 1972 criminal trial provided him with an "innocent only" hearing, and we reject any assertion that the trial was not an adequate substitute for a discharge hearing.

Although we believe that fundamental fairness warrants that respondent be given substantial opportunity to clear his name and to remove the "cloud of an unliqui-

dated criminal charge" from his record (*Klopfer v. North Carolina* (1967), 386 U.S. 213, 227, 18 L. Ed. 2d 1, 10, 87 S. Ct. 988, 995 (Harlan, J., concurring)), it would be premature to give him another "innocent only" hearing, since we have already determined that respondent is entitled to a new fitness hearing. If respondent is found to be fit to stand trial, his interest in clearing his name will be fully protected by the criminal trial, and a discharge hearing would be unnecessary.

However, because of the unusual circumstances of this case, we believe that respondent should be provided with another discharge or "innocent only" hearing if the circuit court determines that respondent remains unfit to stand trial for murder. More than 14 years have elapsed since respondent's criminal trial on the murder charge. Respondent's attorney claims that subsequent to the original criminal trial he discovered "exculpatory evidence" which could affect the outcome of another hearing. Moreover, in the several years since the criminal trial, additional information has been learned about respondent's mental condition. This evidence may or may not have a bearing on respondent's guilt or innocence. In *People ex rel. Myers v. Briggs* (1970), 46 Ill. 2d 281, 287, another opinion involving respondent, the court remarked that the "facts in this case are unique in American jurisprudence." Nine years later, the court commented perhaps somewhat understatedly, "His [respondent's] legal history for the past 14 years illustrates the nature and complexity of the problem." (*People v. Lang* (1979), 76 Ill. 2d 311, 317.) Because of the "uniqueness" of this case and the "nature and complexity" of the legal issues involved, this court over the past 20 years has been forced on occasion to follow its own wisdom and good conscience in fashioning solutions which will adequately protect this respondent's rights and further society's substantial interests in justice and

safety. Guided by these principles, we hold that respondent is entitled to a discharge or "innocent only" hearing if the circuit court finds respondent to be unfit to stand trial and further finds that there is not a substantial probability that he will become fit within one year. If respondent then requests a discharge hearing, the circuit court should then conduct such a hearing in accordance with sections 104—23(a) and 104—25, as now amended. See Ill. Rev. Stat. 1985, ch. 38, pars. 104—23(a), 104—25.

Respondent also raises several issues with respect to his involuntary-admission status under the Mental Health Code. Some of his arguments relate to the criteria for involuntary admission. Respondent asserts that section 1—119 of the Mental Health Code (Ill. Rev. Stat. 1985, ch. 91½, par. 1—119) is unconstitutionally vague, and further argues that this court's standard equating "mental illness" with "unfitness not due to solely a physical condition" violates the due process and equal protection guarantees of the Federal and Illinois constitutions. The remaining issues concern alleged errors in the involuntary-admission proceedings. He argues that the State failed to present clear and convincing proof that he was a person subject to involuntary admission. In addition, he asserts that several of the orders of involuntary admission were based on inadmissible evidence and must be reversed.

The criteria for involuntary admission are set forth in section 1—119 of the Mental Health Code. (Ill. Rev. Stat. 1985, ch. 91½, par. 1—119.) Section 1—119 provides in relevant part:

" 'Person subject to involuntary admission' or 'subject to involuntary admission' means:

(1) A person who is mentally ill and who because of his illness is reasonably expected to inflict serious physical harm upon himself or another in the near future; or

(2) A person who is mentally ill and who because of his illness is unable to provide for his basic physical needs so as to guard himself from serious harm." (Ill. Rev. Stat. 1985, ch. 91½, par. 1—119.)

As previously explained by this court in *People v. Lang* (1979), 76 Ill. 2d 311, 326, the standards in section 1—119 represented a departure from the previous standards for civil commitment in effect prior to 1979. The court in *Lang* stated:

"The necessary requirement of dangerousness has been retained in the definition of one who is committable, but under this definition no longer need he be afflicted with a mental disorder. Although the person must be 'mentally ill' the new code does not define that term. The Governor's Commission [for Revision of the Mental Health Code of Illinois], by way of explanation of this recommended change, stated concerning the use of the term 'mentally ill':

'That term is left undefined as in prior codes, largely because any definition which could be made legally explicit would necessarily be so broad or circular as to preclude accurate application. By not providing an explicit statutory definition, a common law definition fashioned by the courts on a case-by-case basis is deemed to be preferable as it has been in the past.' Report, Governor's Commission for Revision of the Mental Health Code of Illinois, 1976, at 14." 76 Ill. 2d 311, 326.

Prior to this court's 1979 opinion in *Lang*, the circuit court, in December 1976, had determined that respondent did not meet the criteria for civil commitment under the then-existing mental health code (see Ill. Rev. Stat. 1975, ch. 91½, par. 1—11). The court concluded that respondent was unfit to stand trial, but found that he did not have a " 'clearly diagnosed mental disorder' " and "was not mentally retarded." (*People v. Lang* (1979), 76 Ill. 2d 311, 320.) However, the circuit court did find that respondent suffered from a " 'combined physical and

mental condition.' " (76 Ill. 2d 311, 320.) There also was "substantial evidence concerning the dangerous traits which [respondent] possessed." (76 Ill. 2d 311, 331.) Finally, considerable concern was expressed that respondent, because of his several handicaps, was unable to adequately care for himself and was in desperate need of care and treatment.

The court in *Lang* saw the change in the civil commitment standards in the interim between the 1976 civil commitment hearing and respondent's 1979 appeal as a means of resolving the difficult dilemma presented. The court noted that "[t]oo often, in considering whether a person is subject to involuntary commitment, attention has focused on the nature of the disability," rather than the "more important condition" that the person be reasonably expected to be a danger to himself or others as a result of his mental disorder. (*People v. Lang* (1979), 76 Ill. 2d 311, 324-25.) It held:

> "Hereafter, if a person is found unfit to stand trial, he should be considered to be mentally ill under the [Mental Health] Code unless his unfitness is due to a solely physical condition. If that person also meets the dangerousness requirement of the Code, he should be considered to be a 'person subject to involuntary admission.' " 76 Ill. 2d 311, 327.

There appears to have been some confusion in the lower courts not only in this case but also in others in applying the above language from our earlier *Lang* opinion. Lack of fitness to stand trial is by no means the only type of disability that falls within the category of "a person who is mentally ill" as that phrase is used in section 1—119 of the Mental Health Code. Lack of fitness to stand trial is included within the broad definition of a "mentally ill person" which is set forth later in this opinion. As noted above and in this court's earlier *Lang* opinion a person can be mentally ill and dangérous (and

subject to involuntary admission) and still be fit to stand trial (People v. Lang (1979), 76 Ill. 2d 311, 327). Thus a person found unfit to stand trial and dangerous is mentally ill and subject to involuntary admission under section 1—119; however, because of the broader definition of a "mentally ill person" adopted herein, all mentally ill persons subject to involuntary admission are not unfit to stand trial. We feel that if the courts acknowledge this distinction and apply the definition of a "mentally ill person" set out below there should be no confusion. We note that it is somewhat ironic that the mental-illness–unfitness definition adopted in 1979 has had almost a nonexistent role in the subsequent involuntary-admission hearings involving respondent. Scant evidence of respondent's fitness to stand trial has been introduced at the involuntary-admission proceedings. Instead, the State has focused its case for involuntary admission on attempting to prove the elements set forth in section 1—119 of the Mental Health Code. In view of our explanation of the holding of our previous opinion in Lang and the definition of a "mentally ill person" set forth in this opinion, we think it is unnecessary to consider respondent's arguments that the standard violates the equal protection and due process guarantees of the Federal and Illinois constitutions. We emphasize that our holding does not change the fact that a defendant found unfit to stand trial may be subject to involuntary admission if there is clear and convincing evidence that the defendant meets the criteria in section 1—119 of the Mental Health Code. Moreover, we do not foresee that our holding will have a substantial effect on involuntary-admission proceedings involving unfit defendants, since often a defendant found unfit to stand trial because of a "mental *** condition" (Ill. Rev. Stat. 1985, ch. 38, par. 104—10) will also be "mentally ill" for purposes of section 1—119 of the Mental Health Code (Ill. Rev. Stat. 1985, ch. 91½,

par. 1—119).

In the past we think that too much emphasis has been placed on the existence or nonexistence of a recognizable psychiatric disease in determining whether a person is "mentally ill" for purposes of civil commitment. Diagnostic classifications in the mental-health field are constantly undergoing revision (see American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders at 12 (3d ed. 1980) (DSM-III)), and thus it would be unwise to equate the legal term "mentally ill" in section 1—119 with the laundry list of diagnoses or psychiatric classifications in vogue at a given moment. Otherwise, the definition of "mental illness" could ebb and flow depending on the then-current consensus of mental-health professionals. While diagnostic categories are important to mental-health professionals as an aid in the discussion, treatment and study of mental illness, it cannot be expected that lay jurors or even an experienced trial judge will always understand the nuances and significance of a particular psychiatric diagnosis. Moreover, it is well known that "[t]he subtleties and nuances of psychiatric diagnosis render certainties beyond reach in most situations" (*Addington v. Texas* (1979), 441 U.S. 418, 430, 60 L. Ed. 2d 323, 333, 99 S. Ct. 1804, 1811), and even among mental-health professionals there can be substantial disagreement over whether a person exhibits the traits of a specific mental illness. Finally, we note that "[d]espite many recent advances in medical knowledge, it remains a stubborn fact that there are many forms of mental illness which are not understood, some which are untreatable in the sense that no effective therapy has yet been discovered for them, and that rates of 'cure' are generally low. [Citation.] There can be little responsible debate regarding 'the uncertainty of diagnosis in this field and the tentativeness of professional judgment.' " (*O'Connor v. Donaldson* (1975), 422 U.S.

563, 584, 45 L. Ed. 2d 396, 412, 95 S. Ct. 2486, 2498 (Burger, C.J., concurring). See also DSM-III at 1-12.) For the foregoing reasons, we think that a finding of "mentally ill" should not be dependent upon diagnostic categories or nomenclature, but on the extent to which a person's functioning is impaired by his mental illness. A "mentally ill" person for purposes of section 1—119 is an individual with an organic, mental or emotional disorder which substantially impairs the person's thought, perception of reality, emotional process, judgment, behavior, or ability to cope with the ordinary demands of life. As noted in our previous opinion in *Lang*, a person found to be unfit to stand trial falls within this definition. Similar criteria have been suggested by legal scholars and members of the mental health profession (see, *e.g.*, Stromberg & Stone, *A Model State Law on Civil Commitment of the Mentally Ill*, 20 Harv. J. on Legislation 275 (1983); Schmidt, *Critique of the American Psychiatric Association's Guidelines for State Legislation on Civil Commitment of the Mentally Ill*, 11 N. Eng. J. on Crim. and Civil Confinement 11 (1985)), as well as adopted by a number of other States. (See, *e.g.*, Ariz. Rev. Stat. Ann. sec. 36—501 (West 1986); Ind. Code Ann. sec. 16—14—9.1—1(a) (West 1983); Ky. Rev. Stat. Ann. sec. 202A.011(8) (Baldwin 1982); Mich. Comp. Laws Ann. sec. 330.1400a (Supp. 1980); N.H. Rev. Ann. sec. 135—B:2 (1978); N.D. Cent. Code sec. 25—03.1—02 (Supp. 1985).) We also believe our construction of section 1—119 is consistent with legislative intent. The legislature, in enacting section 1—119, obviously intended to draw a line between those mentally ill persons who, because of their illness, pose a serious danger to themselves or others, and those mentally ill who do not. Thus, section 1—119 implicitly requires the illness to be a substantial impairment, *i.e.*, to be serious enough to create a reasonable expectation that the person will in-

flict serious physical harm upon himself or another in the near future, or cause the person to be unable to provide for his basic physical needs so as to guard himself from serious harm.

Respondent argues that the term "mentally ill" in section 1—119 violates due process because it is unconstitutionally vague. A statute is void for vagueness if it " 'fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute" (*Papachristou v. City of Jacksonville* (1972), 405 U.S. 156, 162, 31 L. Ed. 2d 110, 115, 92 S. Ct. 839, 843), or if there is an absence of standards restricting the discretion of governmental authorities or courts who apply the law (*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.* (1982), 455 U.S. 489, 498, 71 L. Ed. 2d 362, 371, 102 S. Ct. 1186, 1193; *Grayned v. City of Rockford* (1972), 408 U.S. 104, 108-09, 33 L. Ed. 2d 222, 227-28, 92 S. Ct. 2294, 2298-99). The vagueness doctrine's requirement of "fair notice" does not apply to section 1—119, since the statute does not proscribe any conduct. Rather, a person is subject to involuntary admission if he or she possesses certain characteristics described in the statute. As such, "no necessity exists for guidance so that one may avoid the applicability of the law." (*Boutilier v. Immigration & Naturalization Service* (1967), 387 U.S. 118, 123-24, 18 L. Ed. 2d 661, 666, 87 S. Ct. 1563, 1566-67 (term "psychopathic personality" used in deportation statute not unconstitutionally vague). See also *Stamus v. Leonhardt* (S.D. Iowa 1976), 414 F. Supp. 439, 451-52 (civil commitment statute does not implicate "fair notice" problem often resulting from vague statutes).) However, we must still consider respondent's argument that section 1—119 allows for too much discretion in its application.

Courts should strive whenever possible to construe a statute so as to uphold its constitutional validity (*Harris*

*v. Manor Healthcare Corp.* (1986), 111 Ill. 2d 350, 362-63; *Sayles v. Thompson* (1983), 99 Ill. 2d 122, 125), and a vagueness challenge to a statute will not be upheld if judicial construction of the statute renders it sufficiently definite so as to preclude its arbitrary application (*United States v. Harriss* (1954), 347 U.S. 612, 618, 98 L. Ed. 989, 996-97, 74 S. Ct. 808, 812; *United States v. Little* (9th Cir. 1984), 753 F.2d 1420; *High Ol' Times, Inc. v. Busbee* (11th Cir. 1982), 673 F.2d 1225). If a statute can be rendered more definite by reasonable construction, the courts are under a duty to give the statute that construction. (*United States v. Harriss* (1954), 347 U.S. 612, 618, 98 L. Ed. 989, 996-97, 74 S. Ct. 808, 812.) As this court explained in *Sayles v. Thompson* (1983), 99 Ill. 2d 122, 125, "[i]t is our duty to construe acts of the legislature so as to affirm their constitutionality and validity, if it can be reasonably done, and further if their construction is doubtful, the doubt will be decided in favor of the validity of the law challenged."

Respondent contends that section 1—119 is vague because the term "mentally ill" is not defined in the statute. We disagree. Today we have construed "mentally ill" to mean an illness or disorder which substantially impairs the person's thought, perception of reality, emotional process, judgment, behavior, or ability to cope with the ordinary demands of life. This definition is sufficiently precise to satisfy due process. (See, *e.g., In re Slabaugh* (1984), 16 Ohio App. 3d 255, 475 N.E.2d 497; *F.J. v. State* (Ind. Ct. App. 1980), 411 N.E.2d 372.) Even without the above explication of the term mentally ill, we think that section 1—119 would survive respondent's vagueness challenge. A person of common intelligence would comprehend the statute as including only those mentally ill who pose a danger to the public or themselves, and as excluding those mentally ill who do not. Section 1—119 requires not only a finding that a person

is "mentally ill" but also that, *"because of his illness,"* he is reasonably expected to be a serious danger to himself or others, or he is unable to care for his basic physical needs, so as to guard himself from serious harm. We think that these additional requirements sufficiently restrict the ability of courts or juries to apply the law arbitrarily.

The cases relied on by respondent held invalid statutes which were far less precise than the statute here and, as such, are clearly distinguishable. (See *Gross v. Pomerleau* (D. Md. 1979), 465 F. Supp. 1167, 1174 (police department memorandum instructed officers to admit arrestees to hospital for evaluation "upon suspicion" of mental illness); *Stamus v. Leonhardt* (S.D. Iowa 1976), 414 F. Supp. 439, 443 (statute authorized involuntary commitment upon finding that person was mentally ill and a "fit subject for custody or treatment").) Indeed, involuntary-commitment standards closely analogous to the standards in section 1—119 consistently have been upheld when challenged on vagueness grounds. (See, *e.g., People v. Taylor* (1980), 274 Colo. 59, 618 P.2d 1127; *Doe v. Gallinot* (C.D. Calif. 1979), 486 F. Supp. 983; *In re Beverly* (Fla. 1977), 342 So. 2d 481; *In re Salem* (1976), 31 N.C. App. 57, 228 S.E.2d 649; *State v. O'Neill* (1976), 274 Or. 59, 545 P.2d 97; *In re Williams* (La. App. 1974), 297 So. 2d 458. *Cf. Boutilier v. Immigration & Naturalization Service* (1967), 387 U.S. 118, 119, 18 L. Ed. 2d 661, 663, 87 S. Ct. 1563, 1564 (Federal statute excluding "[a]liens afflicted with psychopathic personality, epilepsy, or a mental defect" is not void for vagueness); *Money v. Krall* (1982), 128 Cal. App. 3d 378, 180 Cal. Rptr. 376 (civil commitment statute not unconstitutionally vague even though "mentally retarded" not defined in statute); *In re Vandenberg* (1980), 48 Or. App. 609, 617 P.2d 675 (commitment statute for mental deficiency not unconstitutionally vague).) We therefore reject

respondent's argument that section 1—119 is void for vagueness.

Next, we consider respondent's argument that the evidence did not clearly and convincingly establish that he was a person subject to involuntary admission. Respondent contends that the evidence supports the conclusion that he is "developmentally disabled" and not mentally ill. He further attacks the credibility of the State's expert witnesses, complaining that the experts' diagnoses "ebbed and flowed, waxed and waned according to their utility and convenience at any given moment." Finally, respondent argues that the State's evidence did not clearly and convincingly prove that he is reasonably expected to inflict serious physical harm upon himself or another in the near future. Respondent apparently contests all six of the orders for involuntary admission that are the subject of the present appeal. For purposes of determining the sufficiency of the evidence, each hearing must be considered separately. After reviewing the record of each of these hearings we conclude that the State's evidence clearly and convincingly proved that respondent met the criteria for involuntary admission.

The circuit court heard the testimony of four psychiatrists and five psychologists over the course of the six involuntary-admission proceedings that are the subject of this appeal. Some of the expert witnesses testified at more than one hearing. The record shows that there was substantial agreement among the expert witnesses that respondent is mentally ill.

Dr. McCay Vernon, whose testimony was considered at the third, fourth, and sixth hearings on involuntary admission, diagnosed respondent as suffering from surdophrenia or primitive personality. He explained that the diagnosis is unique to deaf people and had the following characteristics: normal or near normal intelligence; almost total absence of language development; and social

information and knowledge are childlike, with major gaps in certain areas where there is good knowledge. He testified that respondent has "a significant impairment of functioning in major areas" and perceives the world "[t]raumatically differently" than most deaf people. Subsequently, Dr. Vernon testified that his previous diagnosis of surdophrenia was reinforced by medical findings that respondent suffered from glaucoma and "salt and pepper retinopathy." Both eye conditions were indicative of prenatal rubella, and Dr. Vernon explained that rubella deaf are more likely than the general deaf population to exhibit behavior problems such as excitability, explosiveness, hyperactivity, and cognitive disorders like memory problems, sequencing, and problems learning language. He observed that respondent responds with greater excitability to stress and frustration than most deaf persons and exhibited letter reversals in his writing and problems with memory.

Dr. John Mitchell, whose testimony was considered at the third, fourth, sixth, seventh, and eighth hearings on involuntary admission agreed with Dr. Vernon's diagnosis of primitive personality or surdophrenia. He described some of the illness' characteristics as occasional poor impulse control, occasional difficulty in adapting to new situations, and lack of development of certain abstract ideas. He also testified that respondent had a low tolerance for delayed gratification and was easily frustrated, noting that respondent became "explosive" and angry when people misunderstood him or respondent misunderstood the situation. The diagnosis of surdophrenia also was advanced by Dr. Gregory Szcerbinauk, a psychiatrist. He testified at the third hearing on involuntary admission that respondent becomes angry and frustrated when his needs are not met immediately or when he does not understand a particular message.

Dr. Albert Stipes, a psychiatrist, diagnosed respond-

ent as suffering from mild retardation, mixed personality disorder, and prelingual deafness. Dr. Stipes testified that respondent "thinks in such a concrete way," has a low frustration tolerance, and a lack of understanding in social situations.

Dr. Richard Ney, a psychologist, testified at the eighth hearing on involuntary admission that respondent suffered from "antisocial personality disorder." Subsequently, at the ninth hearing on involuntary admission Dr. Ney's diagnosis changed to atypical-impulse-control disorder, atypical pervasive developmental disorder—residual state, atypical personality disorder, and borderline intellectual functioning. He attributed his change in testimony to a greater opportunity to observe and develop a relationship with respondent. Dr. Ney explained that atypical-impulse-control disorder is a "residual category" in the DSM-III which does not meet all the criteria for any one specific impulse-control disorder. He testified that his diagnosis was based in part on "observations that there have been intermittent episodes of aggressive action on the part of" respondent. With regard to the diagnosis of atypical pervasive development disorder—residual state, Dr. Ney stated that the disorder's characteristics included low frustration tolerance, inappropriate or constricted affect, unexplained rage reactions, and difficulty in accepting change. Dr. Ney's diagnosis of atypical personality disorder was explained as including some, but not all, of the symptoms of the paranoid, antisocial, and narcissistic personality disorders.

Dr. Susan Feder, a psychiatrist, agreed with Dr. Ney's diagnoses of atypical-impulse-control disorder, and atypical pervasive developmental disorder, residual state. She also diagnosed respondent as suffering from mixed personality disorder, which was similar to Dr. Ney's diagnosis of atypical personality disorder. She described respondent's mixed personality disorder as including

some, but not all, of the symptoms of the borderline, narcissistic, antisocial and paranoid personality disorders. She opined that respondent has a low frustration tolerance and exhibited perseverative thinking.

Dr. Bernard Green, a psychologist, was called to testify at the ninth hearing on involuntary admission. His primary diagnoses were borderline intelligence and probable neurological impairment—organic brain syndrome. He also opined that there were several indications of respondent's mental illness, including the fact that respondent showed "marked difficulty in terms of impulse control," had problems "modulating his affect," experienced difficulties in interpersonal relationships, and showed signs of withdrawal, aggression and depression. He also noted that respondent had a low frustration tolerance and was suspicious of others. He testified that his diagnoses were not incompatible with the diagnoses of doctors Feder and Ney.

Dr. Robert Donoghue testified at the third, seventh, eighth and ninth hearings on involuntary admission. At the third hearing, Dr. Donoghue opined that respondent was neither mentally ill nor mentally retarded. However, at the eighth hearing he testified that while he was "very loath to call anyone mentally ill," respondent "displays some traits, some characteristics that would classify him as mentally ill" under the DSM-III. He listed those characteristics as "attention deficit," a "conduct disorder problem," and "oppositional tendencies." At the ninth hearing, Dr. Donoghue expressed "mixed feelings" about his previous diagnosis of "conduct disorder." He explained that while sometimes respondent "demonstrates traits that might be indicative of mental illness" he sometimes can be "perfectly normal." According to Donoghue, respondent exhibited, on occasion, explosive reactions, was sometimes unrealistic in his demands, and did not relate well to people.

All of the expert witnesses agreed that a reasonable expectation existed that respondent would inflict serious physical harm upon himself or another in the near future. Dr. Vernon's opinion that respondent posed a danger to society was based on evidence that respondent may have committed two homicides, reports of respondent's aggressive behavior at Chicago-Read, and the opinion that respondent lacked the "tools to cope" in society. Dr. Stipes opined that respondent's inability to communicate, his low frustration tolerance, his lack of understanding in social situations, and past history were all factors that pointed to respondent's potential for violence. Dr. Szcerbinauk stated that respondent became "upset and aggressive" when his needs were not met immediately or when he misunderstood a particular message. Dr. Mitchell opined that respondent became "explosive" and angry whenever he misunderstood something or he was misunderstood by other people. Dr. Ney observed that respondent's behavior was unpredictable, making it difficult to know "what situations will frustrate him" or when he will "lash out at someone." He further noted that there were "intermittent episodes of aggressive action" on the part of respondent. Dr. Feder opined that whenever respondent "cannot have his needs met or understood immediately, then he will act in an unpredictable fashion, and, at times aggressively." She believed a "high risk" existed that respondent would inflict serious harm on others, noting several reasons for her opinion: respondent's inappropriate assessment of his communication skills, his low frustration tolerance, his memory impairment, and indications that he exhibited perseverative thinking. Dr. Green opined that respondent was likely to inflict serious harm on others in an "unstructured setting" because of his low frustration tolerance, suspiciousness, and problems in modulating his affect. Dr. Donoghue was of the opinion that re-

spondent could physically harm others in situations where there was a misunderstanding of intentions. The circuit court also heard testimony from Chicago-Read staff members concerning specific instances where respondent physically attacked staff members or other patients. These acts of physical aggression are more fully described in the facts of this opinion. Our review of the record of these hearings convinces us that there was sufficient evidence to support the circuit court's finding that respondent met the criteria for involuntary admission.

Respondent contends that the testimony with regard to whether he was mentally ill was contradictory and unconvincing. We disagree. The expert testimony for the most part was very credible and convincing. All of the expert witnesses agreed that respondent was mentally ill, and there was substantial agreement as to the characteristics and traits of respondent's mental illness. Further, the evidence clearly and convincingly showed that respondent's illness substantially impairs his ability to function in a number of significant ways. However, the expert witnesses did give divergent opinions with regard to respondent's level of intelligence. Some experts opined that respondent is mentally retarded or borderline, while others concluded that respondent's intelligence was normal or even bright normal. Some of the experts who diagnosed respondent as mentally retarded or borderline conceded that respondent's I.Q. score could have been adversely affected by his inability to understand the test instructions. The circuit court concluded that respondent was not mentally retarded or borderline. The circuit court, as the trier of fact, was in the best position to observe the conduct of the witnesses while testifying, to determine their credibility, and to weigh the evidence. (*Chicago Investment Corp. v. Dolins* (1985), 107 Ill. 2d 120, 124; *People v. Cheek* (1982), 93 Ill. 2d 82, 94.)

Based on the record before us, we think that the circuit court's finding with respect to this issue was supported by clear and convincing evidence.

We also find substantial evidence in the record to support the trial court's finding that there was a reasonable expectation that respondent would inflict serious physical harm on others in the near future. All of the expert witnesses testified concerning the dangerous traits which respondent possesses and were of the opinion that respondent posed a danger to others. This testimony was probative and properly considered by the trier of fact. (See *Barefoot v. Estelle* (1983), 463 U.S. 880, 77 L. Ed. 2d 1090, 103 S. Ct. 3383.) Moreover, the evidence in the record shows that respondent has acted violently or aggressively toward staff and patients at Chicago-Read. Testimony was heard from several witnesses concerning recent instances of aggressive or violent behavior on the part of respondent. Therefore, we reject any contention that the trial court's finding with regard to this issue was not supported by clear and convincing evidence.

The circuit court also concluded that respondent was unable to care for all his basic needs so as to guard himself from serious harm. In particular, the court found that respondent was unable to monitor his own eye medication, and that failure to regularly follow the medication regimen would result in total blindness. These findings were supported by clear and convincing evidence. Moreover, we agree with the State that "[a]ny suggestions that blindness is not 'serious' for a person in Lang's condition would be absurd." We believe that the loss of eyesight to a deaf and dumb person like respondent, whose ability to function normally is already substantially impaired, would be catastrophic.

Respondent also argues that the circuit court erred in allowing doctors Mitchell and Ney to reveal facts contained in staff reports upon which the doctors had relied

in making their diagnoses. He specifically challenges certain testimony offered at the sixth, seventh and ninth hearings on involuntary admission. Both doctors testified that their examinations of respondent had included the review of prior psychological evaluations, staff reports and other medical records. The doctors also testified that they had relied upon such records in making their diagnoses. Over respondent's objections, they were permitted to testify about information contained in staff reports which supported their opinions. Respondent maintains that the information in the records used by the doctors constituted inadmissible hearsay, and that the doctors' testimony contravened evidentiary rules governing expert testimony.

It is well established that even though reports made by others may be substantively inadmissible, an expert may utilize them in forming his opinion so long as experts in the field reasonably rely on such materials. (*Wilson v. Clark* (1981), 84 Ill. 2d 186; *People v. Ward* (1975), 61 Ill. 2d 559.) In *Wilson*, this court adopted Rule 703 of the Federal Rules of Evidence. That rule provides:

> "The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence." (Fed. R. Evid. 703.)

Although neither *Wilson* nor Rule 703 explicitly stated whether an expert witness could testify as to the contents of the records themselves, recently the court held that "the logic underlying Rule 703" and prior case law "compel[ ] the conclusion that an expert should be allowed to reveal the contents of materials upon which he reasonably relies in order to explain the basis of his opin-

ion." *People v. Anderson* (1986), 113 Ill. 2d 1, 9.

The defendant in *Anderson* was charged with murder and armed violence. He defended at trial on the ground of insanity. A psychiatrist called on defendant's behalf testified that he had relied on several reports in forming his opinion as to defendant's sanity. He described the reports as evaluations by psychiatrists, doctors and counselors made while defendant was in the army, similar reports made while defendant was incarcerated in California, reports made by the State's psychiatric experts, and information about a previous offense committed by the defendant. On appeal, this court held that the psychiatrist should have been allowed to reveal the contents of the records which he relied upon in order to explain the basis of his opinion:

> "To prevent the expert from referring to the contents of the materials upon which he relied in arriving at his conclusion 'places an unreal stricture on him and compels him to be not only less than frank with the jury but also *** to appear to base his diagnosis upon reasons which are flimsy and inconclusive when in fact that may not be.' [Citation.] Absent a full explanation of the expert's reasons, including underlying facts and opinions, the jury has no way of evaluating the expert testimony [citation] and is therefore faced with a 'meaningless conclusion' by the witness. [Citation.]" *People v. Anderson* (1986), 113 Ill. 2d 1, 10-11.

The court in *Anderson* also rejected the argument that disclosure of facts and opinions contained in the reports by the expert would constitute hearsay. Noting that hearsay is an extrajudicial statement offered in court to show the truth of the matters asserted, the court emphasized that expert witnesses were being allowed to "disclose the underlying facts and conclusions [in the records] not for their truth but for the limited purpose of explaining the basis for the expert witness' opinion." *People v. Anderson* (1986), 113 Ill. 2d 1, 11-12.

See also *Paddack v. Dave Christensen, Inc.* (9th Cir. 1984), 745 F.2d 1254, 1262; *United States v. Ramos* (11th Cir. 1984), 725 F.2d 1322.

In the present case, both Dr. Mitchell and Dr. Ney referred to certain facts contained in staff reports made at Chicago-Read to explain their opinions. Both doctors testified that they relied on the reports in making their diagnoses. In addition, the record shows that the circuit court allowed the doctors to disclose facts contained in the reports only for the limited purpose of explaining their opinions. After respondent objected to Dr. Mitchell's reference to facts in a report at the seventh commitment hearing, the following colloquy occurred:

"THE COURT: If the objection goes to hearsay, I don't want Dr. Mitchell to be *** testifying as to what happened.

[ASSISTANT STATE'S ATTORNEY]: We are not offering it as testimony as to what happened. We are simply offering it to show the background of his opinion which he is going to be asked to render.

THE COURT: All right."

Dr. Mitchell was asked by the assistant State's Attorney at the sixth commitment hearing to relate the substance of a report "insofar as [he] took that information into account in forming [his] opinion concerning" respondent's condition.

Respondent argues that reports of the type prepared by staff at Chicago-Read are not "reasonably and customarily" relied upon by experts in the field of psychiatry. As such, he contends that the doctors should not have been allowed to disclose the contents of the reports. A similar argument was rejected in *United States v. Lawson* (7th Cir. 1981), 653 F.2d 299. In *Lawson*, a psychiatrist testified that he relied on evaluations prepared by other psychiatrists, reports of observations by staff at a Federal hospital, the defendant's service rec-

ords, and FBI reports in making his diagnosis. Even though there was no evidence introduced at the trial that psychiatric experts "reasonably and customarily" relied on such reports, the court in *Lawson* took judicial notice that the staff and investigative reports "were clearly of the type that psychiatrists would rely upon in making a similar professional judgment." (653 F.2d 299, 302.) We agree with the reasoning in *Lawson*. As it was stated in *People v. Anderson* (1986), 113 Ill. 2d 1, 8, "a patient's psychiatric history is one of the most important criteria in making a diagnosis." Any psychiatric history would be incomplete and unreliable if it did not include the observations of nurses, social workers, and other personnel at the hospital where a patient has received psychiatric treatment. (See *In re Germich* (1981), 103 Ill. App. 3d 626, 629 ("intake staff's reports were customarily relied upon by psychiatrists when diagnosing patients").) We are of the opinion that the records relied on by doctors Mitchell and Ney were as reliable as the staff reports, service records and investigative reports relied on by the experts in *United States v. Lawson* (7th Cir. 1981), 653 F.2d 299, and *People v. Anderson* (1986), 113 Ill. 2d 1. Therefore, we hold that it was proper for the doctors to disclose the information contained in the reports for the limited purpose of explaining their opinions.

Respondent next asserts that the order for involuntary admission entered after the eighth hearing on involuntary admission should be reversed because Dr. Ney failed to give the mandatory warning as set forth in section 3—208 of the Mental Health Code (Ill. Rev. Stat. 1983, ch. 91½, par. 3—208). That section provides:

"Whenever a petition has been executed pursuant to Section 3—507, 3—601 or 3—701, and prior to this examination for the purpose of certification of a person 12 or over, the person conducting this examination shall inform

the person being examined in a simple comprehensible manner of the purpose of the examination; that he does not have to talk to the examiner; and that any statements he makes may be disclosed at a court hearing on the issue of whether he is subject to involuntary admission. If the person being examined has not been so informed, the examiner shall not be permitted to testify at any subsequent court hearing concerning the respondent's admission." Ill. Rev. Stat. 1983, ch. 91½, par. 3—208.

The record shows that Dr. Ney attempted to examine respondent on October 18, 1984. At the time respondent was in restraints. For purpose of the examination, respondent's hands were removed from the restraints, and Dr. Ney tried to communicate with him with the aid of a sign-language interpreter. According to Ney, respondent cooperated in the removal of the wrist restraints and he appeared alert. The doctor testified that he attempted through the interpreter to inform respondent of the purpose of the examination. He also attempted to inform respondent that any statements made by him could be disclosed at a hearing on involuntary admission and that respondent was not required to speak to him. Respondent would not look at the interpreter, and refused to communicate with the doctor or otherwise cooperate in the interview.

Failure to provide a patient with the warnings required by section 3—208 certainly would preclude the examiner from testifying about any statements made by the patient during the course of the examination. However, we do not construe section 3—208 as barring an examiner's testimony if it is derived from other sources. Here, respondent refused to communicate with Dr. Ney for any reason, and the doctor's testimony was based entirely on his review of the records, discussions with Chicago-Read staff members, and his prior observations of respondent. As such, his testimony was properly allowed

by the circuit court.

In a related argument, respondent asserts that the privilege against self-incrimination guaranteed by the fifth amendment to the Federal Constitution (U.S. Const., amend. V) should apply to psychiatric examinations conducted for the purpose of testifying at involuntary-admission proceedings. This argument was not raised in the trial court, and it is therefore waived on appeal. See *Midgett v. Sackett-Chicago, Inc.* (1984), 105 Ill. 2d 143, 153; *People v. Holloway* (1981), 86 Ill. 2d 78, 91.

Respondent also contends that the circuit court impermissibly relied on evidence that others could react negatively to his "gestures, noises and pantomimes" in finding that respondent was a person subject to involuntary admission. He asserts that any order of involuntary admission based even in part on evidence that others will react negatively to his gestures and mannerisms violates his freedom of speech protected by both the Federal and Illinois constitutions. (U.S. Const., amend I; Ill. Const. 1970, art. I, sec. 4.) Respondent's argument is without merit. He does not cite any instance in the record where the circuit court relied on such evidence. Moreover, after reviewing the record, we are convinced that the circuit court did not consider any irrelevant or improper evidence in arriving at its determination that respondent is a person subject to involuntary admission. In each instance, the circuit court's order specified that the court's decision was based on the criteria set forth in the Mental Health Code. The court heard testimony without a jury, and as such, it is presumed that the court was not influenced by incompetent evidence in reaching its decision. (*Reese v. Melahn* (1973), 53 Ill. 2d 508, 512; *McFail v. Braden* (1960), 19 Ill. 2d 108, 120-21; *Chicago Title & Trust Co. v. Village of Lombard* (1960), 19 Ill. 2d 98, 108.) We also note that this issue was not raised in the trial court and is thus waived on appeal.

Respondent also argues that the testimony of Dr. Bernard Green at the ninth commitment hearing should have been stricken because the doctor's psychological report was not disclosed prior to the hearing. The record reveals that on May 13, 1985, the State filed a petition, along with two supporting certificates, requesting that respondent's involuntary-admission status be continued. The certificates in support of the petition were executed by doctors Feder and Ney. A certificate of service also was filed indicating that the petition and certificates were mailed to all interested parties. The record also shows that respondent's attorney did not file a discovery request prior to the ninth hearing on involuntary admission. At the hearing, respondent's attorney objected to the testimony of Dr. Green on the ground that he had not received a copy of the doctor's report prior to the hearing. The circuit court overruled the objection and allowed Dr. Green to testify.

Respondent contends that, under sections 3—704(b), 3—705 and 3—803 of the Mental Health Code (Ill. Rev. Stat. 1985, ch. 91½, pars. 3—704(b), 3—705, 3—803), he was entitled to automatic discovery of Dr. Green's examination and report. We fail to see the relevance of sections 3—704(b) and 3—705 to the issue here. Neither section even refers to psychiatric or psychological reports. Section 3—705 requires that the petition and any "order for examination" entered by a court be served on a respondent and his attorney. (Ill. Rev. Stat. 1985, ch. 91½, par. 3—705.) However, Dr. Green's examination was not court-ordered. We also think that disclosure of Dr. Green's report was not required by section 3—803 of the Mental Health Code. Section 3—803 provides that any court-appointed expert shall file a copy of his report with the court, and that "copies shall be made available to the attorneys for the parties." (Ill. Rev. Stat. 1985, ch. 91½, par. 3—803.) Dr. Green was not a court-appointed ex-

pert, and section 3—803 therefore is not applicable to his report.

Alternatively respondent argues that his case is governed by criminal discovery rules which place the State under "a continuing obligation to disclose all reports or statements of experts." He argues that criminal discovery rules are applicable to his case because he was "committed under a special standard relating to his unfitness to stand trial on a criminal charge." We cannot agree that criminal discovery rules are to be followed in involuntary-admission proceedings. Section 6—100 of the Mental Health Code provides: "Judicial proceedings conducted pursuant to this Act shall be conducted in accordance with the Civil Practice Law, except to the extent the provisions of this Act indicate to the contrary or are inconsistent, in which case this Act governs." (Ill. Rev. Stat. 1985, ch. 91½, par. 6—100.) As such, we think that the legislature intended the civil discovery rules to apply to proceedings conducted pursuant to the Mental Health Code.

Finally, we suggest that the consolidation of appeals from separate commitment orders involving the same respondent should be avoided whenever possible. Because a redetermination of a patient's involuntary-admission status must be made periodically (see Ill. Rev. Stat. 1985, ch. 91½, par. 3—813), appeals from such orders should be handled expeditiously in order to insure that the patient is not deprived of meaningful appellate review. We sympathize with the appellate court's dilemma in this case and realize that the decision to consolidate these appeals was made "in the interest of expediting a final disposition of this protracted matter." (127 Ill. App. 3d 313, 316.) The record shows that much of the delay in prosecuting these appeals was attributed to respondent's attorneys, who asked for several extensions of time in which to file briefs. The record also shows that appellate

cause No. 82—429 was dismissed by the appellate court because respondent's attorneys failed to file the docketing statement and record in compliance with a rule to show cause issued on October 28, 1982, and that cause No. 84—2837 was dismissed on January 16, 1986, for want of prosecution. Both cases were reinstated by the appellate court on respondent's motions. In addition, we believe that respondent was not prejudiced by any delay occasioned by the consolidation of these appeals, since we affirmed the orders for involuntary admission. In the future, however, separate orders for involuntary admission should not be consolidated. Instead, whenever possible, appeals from each order should be reviewed on a separate and expeditious basis.

For the reasons stated, the appellate court is affirmed as to that part of its judgment that granted respondent a fitness hearing. The judgment of the appellate court is reversed insofar as it denies respondent a new discharge hearing. With respect to all other issues raised by respondent by way of cross-appeal, the judgment of the circuit court of Cook County is affirmed. This cause is remanded to the circuit court of Cook County for proceedings consistent with this opinion.

*Appellate court affirmed in part and reversed in part; circuit court affirmed in part and reversed in part; cause remanded.*