*In re* CHARLES CUTSINGER (The People of the State of Illinois, Petitioner-Appellee, v. Charles Cutsinger, Respondent-Appellant).

Second District   No. 2—88—1262

Opinion filed July 19, 1989.

James B. Klein, of Guardianship & Advocacy Commission, of Chicago, and Guardianship & Advocacy Commission, of Elgin (William E. Coffin, of counsel), for appellant.

Paul A. Logli, State's Attorney, of Rockford (William L. Browers and David A. Bernhard, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE LINDBERG delivered the opinion of the court:

Respondent, Charles Cutsinger, appeals from an order of the circuit court of Winnebago County finding respondent to be a person subject to involuntary admission (Ill. Rev. Stat. 1987, ch. 91½, pars. 1—119, 3—809) and hospitalizing him in the Department of Mental Health and Developmental Disabilities (Ill. Rev. Stat. 1987, ch. 91½, par. 3—700 *et seq.*). Respondent contends on appeal that the trial court erred in finding him to be a person subject to involuntary admission. We agree and reverse.

The Mental Health and Developmental Disabilities Code (the Code) provides:

" 'Person subject to involuntary admission' or 'subject to involuntary admission' means:

(1) A person who is mentally ill and who because of his illness is reasonably expected to inflict serious physical harm upon himself or another in the near future; or

(2) A person who is mentally ill and who because of his illness is unable to provide for his basic physical needs so as to guard himself from serious harm." (Ill. Rev. Stat. 1987, ch. 91½, par. 1—119.)

On October 18, 1988, Irene Hulick filed a petition for the involuntary admission of respondent. She alleged that respondent was mentally ill and because of his illness was both "reasonably expected to inflict serious physical harm upon himself *** or another in the near future" and "unable to provide for his *** basic physical needs so as to guard himself *** from serious harm." Certificates from clinical social worker Karl W. Noltemeier and psychiatrist Grace M. Thundiyil were also filed on October 18, 1988. The certificates indicated that both

were of the opinion that respondent was mentally ill and that because of his illness he was "reasonably expected to inflict serious physical harm upon himself *** or another in the near future" but did not indicate that either was of the opinion that because of his illness respondent was "unable to provide for his *** basic physical needs so as to guard himself *** from serious harm."

On October 20, 1988, the court appointed psychiatrist Warren C. Lewis to examine respondent. Dr. Lewis' certificate, filed October 24, 1988, indicated Dr. Lewis was of the opinion that respondent was mentally ill and that because of his illness he was "reasonably expected to inflict serious physical harm upon himself or another in the near future" but did not indicate that Dr. Lewis was of the opinion that because of respondent's illness he was "unable to provide for his *** basic physical needs so as to guard himself *** from serious harm."

A hearing on the petition was held on October 24, 1988. Five witnesses testified: Jacelyn Baney and Lynn Lawrence, who are two of respondent's children; Gloria Sarver, who was a technician at Singer Mental Health Center (Singer); Irene Hulick, who was a mental health specialist at Singer; and Dr. Warren C. Lewis, who was a psychiatrist.

At the conclusion of this hearing, the court found:

"I am persuaded by Dr. Lewis' testimony as to the fact that Mr. Cutsinger is a person who is mentally ill.

I place emphasis and a great deal of weight on these three specific instances of threatening and insultive behavior and also the several references to other episodes of threatening behavior.

I am also very troubled and worried about Mr. Cutsinger's suicide attempt, which would have been successful if it hadn't been for the arrival of his daughter.

I think all these things accumulate to show by clear and convincing evidence that Mr. Cutsinger is a person who, because of his illness, is reasonably expected to inflict serious physical harm upon himself or another in the near future, and I will find that he is subject to involuntary admission."

The court entered a written order finding respondent subject to involuntary admission and ordering him hospitalized. It is from this order that respondent has appealed.

The issue raised by respondent is that the evidence was insufficient to support the court's finding that respondent was subject to involuntary admission. This will, of course, necessitate a review of the relevant evidence. That review, however, may be limited by a recogni-

tion of two questions that are not issues on appeal and of the rules governing a sufficiency of the evidence claim on appeal of an order finding a person subject to involuntary admission.

The first question that is not an issue is whether respondent was mentally ill. (See Ill. Rev. Stat. 1987, ch. 91½, par. 1—119.) It was undisputed in the trial court and is undisputed on appeal that respondent was mentally ill, having bipolar disorder.

■ The second question that is not an issue is whether respondent "because of his illness [was] unable to provide for his physical needs so as to guard himself from serious harm." (Ill. Rev. Stat. 1987, ch. 91½, par. 1—119(2).) This was alleged in Hulick's petition and was testified to by Dr. Lewis at the hearing.

However, neither the certificates filed with the petition nor Dr. Lewis's certificate filed the day of the hearing indicated that Noltemeier, Thundiyil, or Lewis was of the opinion that respondent "because of his *** illness [was] unable to provide for his *** basic physical needs so as to guard himself *** from serious harm." (See Ill. Rev. Stat. 1987, ch. 91½, pars. 3—702, 3—703 (regarding examination of a respondent separately by a psychiatrist and a physician or clinical psychologist or qualified examiner and regarding the filing of certificates by such persons in support of a petition for involuntary admission).) Moreover, the trial court did not find respondent was "unable to provide for his basic physical needs so as to guard himself from serious harm" (Ill. Rev. Stat. 1987, ch. 91½, par. 1—119(2)), but rather premised its finding that respondent was subject to involuntary admission upon his being a person "who because of his illness is reasonably expected to inflict serious physical harm upon himself or another in the near future" (see Ill. Rev. Stat. 1987, ch. 91½, par. 1—119(1)).

■ We note that, on this record, the State does not argue that respondent was subject to involuntary admission because it was proven that respondent was unable to care for his basic physical needs but instead argues that the evidence established that respondent was reasonably expected to inflict serious physical harm upon himself or another in the near future. (See *In re Cochran* (1985), 139 Ill. App. 3d 198, 199-200, 487 N.E.2d 389, 390; Ill. Rev. Stat. 1987, ch. 91½, par. 1—119.) Thus, the propriety of the trial court's finding that respondent was subject to involuntary admission depends upon whether the evidence was sufficient to establish that either (1) because of respondent's illness, he was reasonably expected to inflict serious physical harm upon himself in the near future, or (2) because of respondent's illness, he was reasonably expected to inflict serious physical harm upon another in the near future. (See Ill. Rev. Stat.

1987, ch. 91½, par. 1—119(1).) Our review of the evidence then is properly limited to these subjects.

■ Our review of respondent's claim that the evidence was insufficient to prove he was subject to involuntary admission is also conditioned by certain legal principles applicable to involuntary admissions. The Code provides:

"No respondent may be found subject to involuntary admission unless that finding has been established by clear and convincing evidence." (Ill. Rev. Stat. 1987, ch. 91½, par. 3—808.)

As the appellate court recently said:

"In a proceeding on a petition for involuntary admission, the State is required to prove the necessary allegations of the petition by clear and convincing evidence. (*In re Stephenson* (1977), 67 Ill. 2d 544, 367 N.E.2d 1273.) A factual basis for the medical opinion upon which the decision to commit is based must be judged by a similar standard. (*People v. Sansone* (1974), 18 Ill. App. 3d 315, 309 N.E.2d 733.) To meet its burden of proof the State must submit 'explicit medical testimony' that the respondent can be expected to be a serious danger to himself or someone else because of his mental illness. (*In re Cochran* (1985), 139 Ill. App. 3d 198, 200, 487 N.E.2d 389, 391.) Mental illness alone will not justify commitment. *People v. Lang* (1986), 113 Ill. 2d 407, 498 N.E.2d 1105.

The trial court's decision following an involuntary admission hearing is given great deference and will not be set aside at the appellate level, even if the reviewing court, after applying the clear and convincing standard, would have ruled differently. (*In re Mazzara* (1985), 133 Ill. App. 3d 146, 478 N.E.2d 567.) The trial court is in the best position to determine the credibility of the testifying witnesses and weigh the evidence. Its determination should not be reversed unless it is manifestly erroneous. *People v. Foster* (1979), 76 Ill. 2d 365, 392 N.E.2d 6." (*In re Orr* (1988), 176 Ill. App. 3d 498, 504-05, 531 N.E.2d 64, 69.)

So, the propriety of the trial court's finding that respondent was subject to involuntary admission depends upon whether there was explicit medical testimony and clear and convincing evidence of the factual basis for the medical opinion either that, because of his illness, respondent was reasonably expected to inflict serious physical harm upon himself in the near future or that, because of his illness, respondent was reasonably expected to inflict serious physical harm upon another in the near future.

■ The only medical testimony in the case at bar was that of Dr.

Lewis. With respect to his opinions and their factual bases regarding whether respondent would be reasonably expected to inflict serious physical harm upon himself or another in the near future because of his illness, Dr. Lewis testified:

"Q. [Assistant State's Attorney] Is it a further opinion that because of his mental illness, he is reasonably expected to inflict serious physical harm upon himself or another in the near future?

A. [Dr. Lewis] I have such an opinion.

Q. What is your opinion[?]

A. That he is a danger to others by his threatening behavior.

Q. Okay. Do you have a further opinion that because of his illness, he is able or unable to provide for his basic needs so as to guard himself from serious harm?

A. I have such an opinion.

Q. What do you base that opinion on[?]

A. Since he has been in a situation recently where his needs were provided for, I am of the opinion that he is unable to handle himself independently. We have some evidence on that."

Dr. Lewis thus did not explicitly testify that respondent, because of his illness, was reasonably expected to inflict serious physical harm upon himself in the near future. (See Ill. Rev. Stat. 1987, ch. 91½, par. 1—119(1).) The trial court's finding that, because of his mental illness, respondent was reasonably expected to inflict serious physical harm upon himself in the near future was manifestly erroneous and the finding that respondent was subject to involuntary admission cannot be upheld on that basis.

Dr. Lewis did explicitly testify that he was of the opinion that, because of his illness, respondent was reasonably expected to inflict serious physical harm upon another in the near future. According to Dr. Lewis, defendant was "a danger to others by his threatening behavior." Earlier in his testimony and on his certificate, Dr. Lewis noted the threatening behavior on which he based his opinion:

"He is alleged to have become violent and threatening toward the staff here.

\* \* \*

On the 9th [of October 1988] he was swinging his fists at the staff.

On the 17th he was threatening to beat up residents, was disruptive on the ward.

\* \* \*

He appeared to me to be suspicious and unpredictable."
It is necessary to examine the evidence to determine whether it was manifestly erroneous to find by clear and convincing evidence that respondent had engaged in threatening behavior sufficient to support an opinion that respondent was "reasonably expected to inflict serious physical harm upon *** another in the near future." Ill. Rev. Stat. 1987, ch. 91½, par. 1—119(1).

Respondent's daughters' testimony related primarily to other issues and did not in any way concern the incidents upon which Dr. Lewis based his opinion. Jacelyn Baney did testify that respondent, since his arrival at Singer, had made frequent annoying telephone calls to her. He threatened to sue her and other people and "he just gets outrageous on the phone." Baney's 14-year-old son, apparently based on these telephone calls, was afraid respondent would come to their home and hurt him. Baney further testified that respondent had never harmed her. Lynn Lawrence's testimony did not touch on threatening behavior at all.

Two of the witnesses did testify about the facts upon which Dr. Lewis based his opinion. These witnesses were Gloria Sarver and Irene Hulick, both on staff at Singer.

Sarver, a technician, testified that at about 10 a.m. on October 23, 1988, respondent was threatening patients in the day room at Singer. She did not "remember exact words, but he tells 'em to do this and shut up and don't smoke that or else." The morning of October 17, 1988, respondent came up to the desk where Sarver was, and he was mad because they could not answer a request at that time. Sarver described this incident as follows:

"Q. [Assistant State's Attorney] Okay. And what did he say[?]

A. [Sarver] 'Cause I said, just a minute, and that makes him mad.

Q. Okay. And what did he say then[?]

A. Just a minute. Just a minute. You always say just a minute. I'm going to get ahold of [Congresswoman] Lynn Martin and sue you and get you off your lazy asses and—."

Sarver did not recall any other incidents specifically: "[s]ome days he's good, and then other days he's in this threatening mood." Sarver further testified that respondent had never harmed her or threatened her or anybody physically. He was verbally threatening and would sometimes physically go near other patients "to further intimidate 'em," but he did not touch them "or threaten them with his hands or anything."

Hulick, a mental health specialist, testified about an incident that occurred the morning of Monday, October 17, 1988. The preceding Friday, while respondent's regular caseworker was gone and the supervisor was ill, Hulick had given respondent some money from his trust fund. On October 17 respondent came into the team office to ask that money be withdrawn from his trust fund. Respondent went on and on, saying that Hulick did not give him any money on Friday and he had to go without money all weekend. At first he was talking to the supervisor and Hulick was not saying anything. Then, all of a sudden, he got into the money and turned on Hulick, becoming very abusive and threatening. He threatened Hulick by yelling that she was "absolutely *** inadequate and basically an ass and a bitch" and that she did not give him any money on Friday. Hulick said that she had given him money on Friday and the more she tried to explain the louder he got "and it was kind of like I'll sue you and I'm calling Lynn Martin and, you know, you're going to be out of here, and on and on." Hulick felt angry and finally dropped it because she was getting nowhere with the conversation. The supervisor got up and asked respondent to leave the office, telling him that he could not come in the office and be that abusive and threatening to people.

During this incident Hulick felt she was in danger of being hurt by respondent because "he turned on me and was very, very angry." Also, there had been several other incidents the week before involving just Hulick and the money: "that's been kind of an ongoing, continual harassment from him about his money."

There was no evidence that respondent had become violent toward the staff at Singer, that he was swinging his fists at the staff on October 9, or that he was threatening to beat up residents on October 17, which were the most serious of the "facts" on which Dr. Lewis based his conclusion that respondent had engaged in threatening behavior which made him dangerous to others. In fact, the evidence tended to show that respondent never harmed anyone, did not physically touch others during his arguments with them, and did not physically threaten anyone or make threatening gestures with his hands. What he did was become very angry, become very loud, use abusive language, threaten to sue, threaten to call Lynn Martin, and in some instances advance toward the person with whom he was arguing.

■ Thus, certain important facts in the factual basis for Dr. Lewis's opinion that respondent was dangerous to others were not proven by clear and convincing evidence. The facts which were proven established that respondent was a very disagreeable and verbally abusive older gentleman who got into a lot of loud arguments,

but were not sufficient to provide a factual basis for an opinion that respondent was "reasonably expected to inflict serious physical harm upon *** another in the near future" (Ill. Rev. Stat. 1987, ch. 91½, par. 1—119(1)). The trial court's finding that, because of his mental illness, respondent was reasonably expected to inflict serious physical harm upon another in the near future was manifestly erroneous, and the finding that respondent was subject to involuntary admission cannot be upheld on that basis.

Accordingly, the trial court's finding that respondent was subject to involuntary admission was manifestly erroneous, and the judgment of the circuit court is reversed.

Reversed.

WOODWARD and REINHARD, JJ., concur.