*In re* E.L., Alleged to be a Person Subject to Involuntary Administration of Psychotic Medication (The People of the State of Illinois, Petitioner-Appellee, v. Elizabeth L., Respondent-Appellant).

First District (6th Division)    Nos. 1—99—0335, 1—99—0336 cons.

Opinion filed September 22, 2000.

William E. Coffin, of Guardianship and Advocacy Commission, of Chicago,

and Patricia Werner, of Guardianship and Advocacy Commission, of Des Plaines, for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, Janet Powers Doyle, and Jennifer Zucker, Assistant State's Attorneys, of counsel), for the People.

JUSTICE BUCKLEY delivered the opinion of the court:

This is a consolidated appeal from an order finding respondent, Elizabeth L., subject to involuntary admission at Evanston Hospital pursuant to section 1—119 of the Illinois Mental Health and Developmental Disabilities Code (the Mental Health Code) (405 ILCS 5/1—119 (West 1996)) and from a subsequent order finding Elizabeth subject to the involuntary administration of psychotropic medication pursuant to section 2—107.1 of the Mental Health Code (405 ILCS 5/2—107.1(West 1996)). With respect to the first order, Elizabeth raises the following issues on appeal: (1) whether the State's failure to submit the required dispositional report in writing mandates reversal; and (2) whether the State proved by clear and convincing evidence that Elizabeth was unable to care for her basic physical needs so as to guard herself from serious harm. With respect to the order for the involuntary administration of psychotropic medication, Elizabeth raises the following issues on appeal: (1) whether the trial court abused its discretion by refusing to consider evidence of events that occurred after the filing of the petition; and (2) whether the State proved that Elizabeth lacked the capacity to make an informed decision about her medication.

STATEMENT OF FACTS

A. TESTIMONY RELATED TO PETITION FOR INVOLUNTARY ADMISSION

A petition for the involuntary admission of Elizabeth was filed on December 14, 1998. The petition alleged that on December 11, 1998, Elizabeth, a 24-year-old woman, was brought by ambulance to the St. Francis Hospital emergency room after telling workers on the El platform that someone was trying to kill her and that her parents had been killed.

A hearing on the matter took place on December 30, 1998, at which time Dr. Thomas Rebori, M.D., the only witness, testified that he is a board-certified psychiatrist and practices at Evanston Hospital. He stated that he has been Elizabeth's treating psychiatrist since she was admitted to Evanston Hospital, and he has seen her daily except

for weekends. He stated that Elizabeth has "for the most part" refused to talk to him. He stated that when he knocks on her door to speak with her she tells him that he cannot come in. When he enters her room, she gets out of bed, turns around and stares at the wall, refusing to speak.

Dr. Rebori testified that his diagnosis of Elizabeth is "psychotic disorder not otherwise specified." His diagnosis is based on his examination of Elizabeth's records, his observations of her, and his discussions with staff members regarding their observations of her. Dr. Rebori stated that he is unable to determine whether the differential is "depression with psychotic features" or "distinct paranoid type" because Elizabeth has not given him permission to speak with her family. He further stated that her family has called him and he explained to them that he is unable to speak with them.

Dr. Rebori further testified that Elizabeth has remained isolated in her room, refused to eat or drink early in her hospitalization, and at various times would scream suddenly. He stated that Elizabeth has refused to come out for "group" and has refused to meet with various people on her treatment team. Dr. Rebori stated that Elizabeth has been observed staring at the wall for up to five hours at a time and has also been observed standing in the shower and staring up at the ceiling for several hours at a time. He also stated that, later on in her hospital stay, rather than refusing to eat, she began eating large quantities of food and stealing food off other people's plates. He further testified that Elizabeth has told staff members that her parents are dead and that she believes she is dying of cancer. He stated that she has been examined by an internal medicine physician, and she does not have cancer.

Dr. Rebori testified that Elizabeth is diabetic and has refused "finger sticks," which are necessary to check her blood-sugar level. He stated that Elizabeth has refused to take Gluchophage, an oral medication that she takes for her diabetes. Dr. Rebori stated that, by refusing to take Gluchophage, Elizabeth puts herself at risk of her blood sugar rising, which could result in diabetic ketosis byproducts in the blood or could induce a coma. He stated that he has also offered her Risperdal and Haldol, which are antipsychotic medications, and she has refused to take both. Dr. Rebori stated that Elizabeth has, on occasion, told the staff that she will take her medication and subsequently refused it.

Dr. Rebori testified that, as a result of her mental illness, Elizabeth is unable to take care of her basic physical needs to protect herself from serious harm. He stated that her refusal to take medication allows her disorganization to continue, and her inability to take care of

her diabetes is potentially life threatening. He stated that, because she believes her parents are dead, she would not be able to find shelter if released and, because of the cold weather, would be at risk of dying of hypothermia. He further stated that her inability to problem solve puts her at risk of becoming a crime victim.

Dr. Rebori testified that Elizabeth spoke with him the day before the hearing for about three minutes with her attorney present. Dr. Rebori asked Elizabeth what she was doing on the El platform and she told him that she had great pressure in her head and that she could not think clearly enough to get off the platform. He asked her if she was willing to take her medication and she said no. He asked her if she wanted to talk about her court date and she said no. Dr. Rebori stated that Elizabeth is suffering from paranoid delusions which include him and the staff at Evanston Hospital and which prevent her from engaging in treatment.

Dr. Rebori stated that he recommends that Elizabeth remain in the hospital and take her medication. He also recommends that she allow him to speak with her family so that discharge planning can be arranged and that she agree to follow up with a psychiatrist. He stated that he did not discuss less restrictive treatment alternatives with her because she refused to speak with him. He stated that he does not presently recommend a lesser level of care for Elizabeth because she is not taking her medication and she would not be safe.

On cross-examination, Dr. Rebori stated that Elizabeth spoke with him that day. He stated that she recognized that if she did not manage her diabetes it could cause her to become greatly ill. When he spoke with her about her diabetes medication, she told him that she did not trust the staff to give her the correct medication because the Gluchophage the staff offered her did not look similar to the Gluchophage she purchased at Walgreens. Dr. Rebori also stated that Elizabeth has occasionally agreed to have her blood-sugar level tested and, when she did, the results of the tests have not been so elevated to cause grave concern.

With regard to a less restrictive setting for Elizabeth, Dr. Rebori testified that he has not been able to discuss alternatives with her. He also stated that he has not contacted other facilities to determine whether another facility might be able to care for her because he has not had permission to do so. He also testified that Elizabeth's parents indicated to him that she lived with them before being admitted to Evanston Hospital. He stated that he did not know whether she could return home if she were discharged. Dr. Rebori testified that if Elizabeth was taking her medication and was engaged in discharged planning and was speaking with her parents then she might be able to

return home; however, he further stated that he does not think she is ready at this time. Dr. Rebori agreed, however, that if Elizabeth start taking her medication and her parents allowed her to return home, then his opinion that there is no other less restrictive alternative for her would change.

At the close of testimony, the State offered into evidence the treatment plan and a social report. The assistant State's Attorney then made the following statement with regard to the written dispositional report required by the Mental Health Code:

"Also, with regard to the less restrictive environment, the Doctor has offered and tried to talk to [Elizabeth] about a less restrictive environment. [Elizabeth] refuses to allow him to even discuss anything with her. He offered to talk to her about a less restrictive environment. We think that satisfies the Mental Health Code."

Counsel for Elizabeth objected and, thereafter, the State offered a written progress note dated December 28, 1998, written by the doctor which reads:

"P[atien]t cont[inues] to refuse med[ication] for psychosis and her diabetes. P[atien]t refuses to speak to me. When asked what does she want to do she replies 'To be left alone so I can sleep.' No insight into her conditions."

The State argued that the written progress report indicates that efforts were made to discuss a less restrictive environment with Elizabeth and that she refused. The trial court found that "under the circumstances" the progress note was sufficient to satisfy the written requirement of section 3—810 of the Mental Health Code (405 ILCS 5/3—810 (West 1996)).

Counsel for Elizabeth conducted re-cross-examination of Dr. Rebori and asked him where in the note did he indicate that he spoke with Elizabeth about other placement possibilities. Dr. Rebori stated that he asked Elizabeth what she wanted to do, and she responded that she wanted to be left alone. Dr. Rebori conceded that it is possible Elizabeth did not understand that he wanted to discuss discharge planning with her and that it is possible that she just wanted to sleep at that time. Dr. Rebori also testified that his intention in making the note was only to document Elizabeth's unwillingness to discuss any assessment of treatment.

Counsel for Elizabeth again objected to the use of the progress note to satisfy the requirement of section 3—810 of the Mental Health Code (405 ILCS 5/3—810 (West 1996)). The trial judge then ruled as follows:

"I am going to rule that there has been a good nature[d] effort made by the Doctor to communicate with the patient, and the patient refused to talk to the Doctor.

Whether she heard or didn't hear, she still deterred the process of advising her to the possibility of a less restrictive alternative, and, therefore, the Doctor could not make that determination."

Following closing arguments, the trial judge found that the evidence of mental illness was clear and convincing. The judge further stated that he "had some hesitation to find that she is unable to take care of her physical needs so as to guard herself from serious physical harm." He went on to note that although the evidence was "not [as] clear and convincing as it should be," it was sufficient to show Elizabeth is unable to provide for her basic needs. Therefore, he found that she was subject to involuntary admission. The judge made no findings as to whether Evanston Hospital was the least restrictive alternative.

## B. TESTIMONY RELATED TO PETITION FOR INVOLUNTARY ADMINISTRATION OF PSYCHOTROPIC MEDICATION

A petition for the involuntary administration of psychotropic medication to Elizabeth was filed on December 15, 1998. After two continuances, a hearing took place on January 6, 1999, at which one witness, Dr. Rebori, testified on the petition for the involuntary admission of Elizabeth. He stated that he has examined her about 20 times and has not yet obtained permission to speak with her past providers or family. He stated that his diagnosis continues to be "psychotic disorder not otherwise specified."

Dr. Rebori testified that, since coming to the hospital, Elizabeth has on many occasions refused treatment for her diabetes, refused her diabetes medication, refused the "finger sticks" necessary to monitor her diabetes and refused to maintain a diabetic diet. Dr. Rebori further testified that psychotropic medication is necessary to treat her; he recommends Risperdal and Haldol. He wants to give her a long-acting dose of Haldol, which is approximately 50 milligrams. He stated that it could be given daily up to a maximum of 200 milligrams. Dr. Rebori testified that the biggest immediate risk in taking Haldol is "extra-pyramidal side effects." The long-term side effect of Haldol is "tardive dyskinesia." He stated that the benefits would be a decrease in her delusions and paranoia, an increase in her organizational skills, and an increase in her ability to take care of her medical problem and live in a less restrictive setting.

Dr. Rebori testified that Elizabeth's prognosis without medication is very poor, and it is likely that her condition would worsen. He stated that her prognosis with medication is excellent, that she has functioned very highly as a college student while on medication, and she has taken care of herself very well. He testified that the benefits of the medication outweigh the risks and that without medication her

disorganization and her delusions will prevent her from taking care of her diabetes and from functioning in an unstructured setting.

Dr. Rebori testified that Elizabeth has been offered medication and, up until the morning of the hearing, has repeatedly refused it. He stated that she does not have the capacity to make a reasoned judgment about the medication. He stated that her delusions involve the treatment staff, and she does not trust that she will receive the correct medication.

Dr. Rebori was asked if any less restrictive services have been explored for Elizabeth and his response was that he has tried to meet with her to discuss discharge planning. He stated that he needs permission to speak with her family and other facilities. He further stated that he does not believe that a lower level of care would be safe for her at this point.

On cross-examination, Dr. Rebori testified that one of the side effects he mentioned, *i.e.*, tardive dyskinesia, is a permanent side effect that has no cure. He also stated that, given the patient's age and sex, it is more likely that she will experience tardive dyskinesia.

Dr. Rebori also testified that Elizabeth voluntarily took Risperdal that morning and also at one point during her hospitalization, but that Elizabeth cited stomach pains as her reason for not wanting to continue the medication. Dr. Rebori testified that he is obligated to obtain informed consent prior to administering medication and that he obtained informed consent that morning when Elizabeth took the Risperdal.

After both sides rested, the judge found that Elizabeth lacked the capacity to make a reasoned decision about the medication at the time the petition was filed and granted the petition, authorizing the involuntary administration of psychotropic medication.

DISCUSSION

A. APPEAL No. 1—99—0335

▇ It is well established that involuntary admission procedures implicate substantial liberty interests. See *In re Robinson*, 151 Ill. 2d 126, 130 (1992). However, these interests must be balanced against the need to provide care for those unable to care for themselves and the need to protect society from the dangerously mentally ill. See *In re Robinson*, 151 Ill. 2d at 130-31; *In re Schumaker*, 260 Ill. App. 3d 723, 727 (1994). In a proceeding on a petition for involuntary admission, the State must prove the allegations of the petition by clear and convincing evidence. 405 ILCS 5/3—808 (West 1996); see *In re Cutsinger*, 186 Ill. App. 3d 219 (1989). The trial court's decision fol-

lowing an involuntary admission hearing is entitled to great deference (see *In re Cutsinger*, 186 Ill. App. 3d at 223), and the reviewing court should not disturb the trial court's finding regarding involuntary admission of a patient to a mental health facility unless it is against the manifest weight of the evidence. See *In re Rovelstad*, 281 Ill. App. 3d 956 (1996).

Elizabeth asserts that the order finding her subject to involuntary admission must be reversed because the State failed to submit the statutorily required dispositional report in writing as required by section 3—810 of the Mental Health Code.

■ Section 3—810 of Mental Health Code provides:

"Before disposition is determined, the facility director or such other person as the court may direct *shall prepare a written report including information on the appropriateness and availability of alternative treatment settings,* a social investigation of the respondent, a preliminary treatment plan, and any other information which the court may order. *** The treatment plan shall describe the respondent's problems and needs, the treatment goals, the proposed treatment methods, and a projected timetable for their attainment. If the respondent is found subject to involuntary admission, the court shall consider the report in determining an appropriate disposition." (Emphasis added.) 405 ILCS 5/3—810 (West 1996).

Here, the State initially argued that Dr. Rebori's attempt to talk to Elizabeth about a less restrictive environment satisfies the requirements of section 3—810 of the Mental Health Code. After counsel for Elizabeth objected to the absence of a written report, the State attempted to characterize a progress note as the dispositional report. After repeated objections by Elizabeth's counsel, the trial judge accepted the progress note as satisfying section 3—810's requirement of a written report explaining the appropriateness and availability of less restrictive treatment settings.

■ We find that the progress note cannot be characterized as a dispositional report under the requirements of section 3—810 of the Mental Health Code. Dr. Rebori himself testified that his intention in making the note was simply to document Elizabeth's unwillingness to speak with him. He also stated that Elizabeth may not have understood that he was attempting to speak with her about less restrictive treatment alternatives. Clearly, there was absolutely no information in the progress note on "the appropriateness and availability of alternative treatment settings" as is required under the Mental Health Code.

Nevertheless, the State maintains that the absence of a written report is harmless because the trial court heard oral testimony on all

of the matters that would have been contained in the report. The State relies on *In re Robinson*, 151 Ill. 2d 126 (1992), and argues it held that strict compliance with section 3—810 is not always necessary. In *Robinson*, our supreme court considered the 1989 version of section 3—810, which did not explicitly require a written report. The court determined that the legislature intended that the report be in writing, but nevertheless affirmed the trial court's finding of involuntary admission despite the absence of a written report. Specifically, the State relies on the following passage from *In re Robinson*:

"It is clear from a reading of section 3—810 as a whole that its purpose is to provide trial judges certain information necessary for determining whether an individual is subject to involuntary admission to a mental health facility. Other purposes of the statute are to protect against unreasonable commitments and patient neglect, and to ensure adequate treatment for mental health care recipients.

The respondent has cited no reason why these goals cannot be met in the absence of an affirmative showing that the trial judge was presented a written predispositional report prepared by a particular person either in advance of or at the time of the hearing." *In re Robinson*, 151 Ill. 2d at 133-34.

While a reading of the above-quoted language appears to support the State's argument, the court's language immediately following the above language demonstrates that the holding of the court is limited to instances where the respondent did not object to the State's failure to prepare a written report. The *Robinson* court expressly stated:

"Where a respondent *fails to object* to the absence of a predispositional report, strict compliance with section 3—810 is required only when the legislative intent cannot otherwise be achieved. [Citation.] *Under these circumstances*, we believe that oral testimony containing the information required by the statute can be an adequate substitute for the presentation of a formal, written report prepared by the facility director or some other person authorized by the court." (Emphasis added.) *In re Robinson*, 151 Ill. 2d at 134.

Thus, according to the supreme court, strict compliance is only excused where counsel for respondent fails to object and where oral testimony adequately provides the required information. See also *In re Robert H.*, 302 Ill. App. 3d 980 (1999) (applying the *Robinson* holding and finding that because counsel for respondent did not object to the absence of a written predispositional report, it was necessary to determine wether testimony at trial was sufficient to satisfy the purposes of section 3—810 of the Code). Here, Elizabeth's counsel repeatedly objected to the absence of a written report; therefore, we find that any oral testimony on what would have been contained in the report is of no effect.

Accordingly, because the State did not meet the requirements of section 3—810 of the Mental Health Code, we hereby reverse the order finding Elizabeth to be a person subject to involuntary admission.

Because our finding is dispositive, we need not address Elizabeth's argument that the State failed to prove by clear and convincing evidence that she is unable to care for her basic physical needs so as to guard herself from serious harm.

## B. APPEAL No. 1—99—0336

Elizabeth contends that the court abused its discretion when it refused to consider evidence of events that occurred after the filing of the petition for involuntary administration of psychotropic medication and, therefore, its order should be reversed.

■ Section 2—107.1 of the Mental Health Code allows for the entry of a court order authorizing mental health treatment for those persons who, as a result of their mental illness, are unable to make competent, reasoned decisions about treatment for themselves. See 405 ILCS 5/2—107.1 (West 1996). Section 2—107.1 provides:

"(4) Authorized involuntary treatment shall not be administered to the recipient unless it has been determined by clear and convincing evidence that all of the following factors are present:

(A) That the recipient has a serious mental illness or developmental disability.

(B) That because of said mental illness or developmental disability, the recipient exhibits any one of the following: (i) deterioration of his ability to function, (ii) suffering, (iii) threatening behavior, or (iv) disruptive behavior.

(C) That the illness or disability has existed for a period marked by the continuing presence of the symptoms set forth in item (B) of this subdivision (4) or the repeated episodic occurrence of these symptoms.

(D) That the benefits of the treatment outweigh the harm.

(E) That the recipient lacks the capacity to make a reasoned decision about the treatment.

(F) That other less restrictive services have been explored and found inappropriate.

(G) If the petition seeks authorization for testing and other procedures, that such testing and procedures are essential for the safe and effective administration of the treatment." 405 ILCS 5/2—107.1(4) (West 1998).

■ Elizabeth argues that the trial court improperly refused to consider evidence of events that occurred after the filing of the petition, *i.e.*, evidence that on the morning of the hearing she was offered and took the psychotropic medication Risperdal. The crux of Eliza-

beth's argument is that because she gave informed consent to psychotropic medication in the days immediately preceding the filing of the petition and on the day of the hearing, she demonstrated that she was capable of making her own treatment decisions and, therefore, the State cannot prove she lacks decisional capacity by clear and convincing evidence as required. See 405 ILCS 5/2—107.1(a)(4) (West 1996).

The State argues that the court did consider the evidence that Elizabeth took Risperdal on the morning of the hearing. However, the record does not bear this out. The trial judge expressly stated:

"[I]t is this Court's view that a petition must be determined upon the facts alleged at the time the petition is filed, and the doctor has testified with regard to the facts, his experience with this patient, the history of this patient with regard to her current hospitalization up to and including the time the petition was filed. So what we get into then is some post filing occurrence which is really not an element in this Court's view of this proceeding."

Similar to a determination finding someone subject to involuntary admission, a determination authorizing involuntary administration of psychotropic medication should include a current evaluation of the respondent's present conduct and state of mind. See *People v. Czyz*, 92 Ill. App. 3d 21, 26 (1980); *People v. Butler*, 69 Ill. App. 3d 556 (1979). This is not to say that because Elizabeth voluntarily took Risperdal in the days preceding the hearing she is automatically deemed competent; it is merely additional evidence to consider. Indeed, the petition in this case was filed on December 15, 1998, but the hearing on the petition was not held until January 6, 1999. Certainly, events occurring in the three-week interim period are relevant to her current level of decisional capacity.

Accordingly, because the trial court refused to consider all of the relevant evidence, *i.e.*, evidence including postpetition events, its order authorizing the involuntary administration of psychotropic medication constitutes an abuse of discretion and is hereby reversed.

Reversed.

CAMPBELL, P.J., and O'BRIEN, J., concur.