2020 IL App (2d) 190743-U
No. 2-19-0743
Order filed December 10, 2020

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 13-CF-1575 |
| STANFORD THOMPSON, | ) ) ) | Honorable John A. Barsanti, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE ZENOFF delivered the judgment of the court.
Presiding Justice Bridges and Justice Hutchinson concurred in the judgment.

**ORDER**

¶ 1     *Held*:  The order committing the defendant into the custody of the Department of Human Services pursuant to section 104-25(g)(2) of the Code of Criminal Procedure of 1963 (725 ILCS 5/104-25(g)(2) (West 2018)) was affirmed where the judgment was not against the manifest weight of the evidence.

¶ 2     Following an evidentiary hearing, the trial court committed defendant, Stanford Thompson, into the custody of the Department of Human Services (DHS) pursuant to section 104-25(g)(2) of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/104-25(g)(2) (West 2018)).  Defendant appeals, arguing that the judgment was against the manifest weight of the evidence.  We affirm.

¶ 3                                I. BACKGROUND

¶ 4     In September 2013, defendant was indicted on three counts of aggravated criminal sexual assault (720 ILCS 5/11-1.30(a)(2) (West 2012)), three counts of criminal sexual assault (720 ILCS 5/11-1.20(a)(1) (West 2012)), and unlawful restraint (720 ILCS 5/10-3 (West 2012)).

¶ 5     In January 2015, defense counsel expressed a *bona fide* doubt as to defendant's fitness to stand trial, and the court ordered a fitness evaluation. The next month, the court found defendant unfit to stand trial. Defendant subsequently received treatment at Choate Developmental Center (Choate). Although defendant was never diagnosed with a mental illness, he had an intellectual disability that his treatment staff characterized as "moderate."

¶ 6     In May 2016, following a discharge hearing pursuant to section 104-25(d) of the Code (725 ILCS 5/104-25(d) (West 2018)), the court found defendant "not not guilty" of all seven charges and ordered his treatment extended for two years. The evidence at the discharge hearing showed that, in the early morning hours of August 24, 2013, defendant attacked a stranger outside of a party that they were both attending. Defendant first physically assaulted the victim, grabbing her neck until she either "blacked out" or was "choked out." When the victim "came back to," defendant punched her multiple times, twice forced her to perform fellatio on him, and raped her.

¶ 7     Until late 2017, personnel from Choate—including the forensic unit director, Michael Jasmon—submitted reports to the court indicating that defendant was unfit to stand trial and that he was not likely to be restored to fitness. In late 2017, Dr. Kathryn Holt, a psychologist, evaluated defendant for the first time. She submitted a report to the court opining that defendant was fit to stand trial. The court subsequently held a restoration hearing that proceeded over multiple dates between July and November 2018.

¶ 8    The first witness at the restoration hearing was Dr. Holt. She testified that she changed defendant's diagnosis from a moderate intellectual disability to a mild intellectual disability. She explained that this change was justified by (1) her conversations with defendant's direct care staff and (2) testing that showed that defendant had a full scale IQ of 56 and an overall age equivalency of an approximately 11-year old child. Dr. Holt administered two tests to ascertain defendant's fitness to stand trial, and he passed both. In her opinion, he was fit to stand trial.

¶ 9    On cross-examination, defense counsel attempted to elicit from Dr. Holt the specific information that defendant told her about his understanding of the charges against him. Dr. Holt was unable to recall what defendant told her specifically, but she was satisfied during the testing that defendant's answers were accurate enough to justify passing scores. Dr. Holt acknowledged that, before testing defendant, she did not review other treatment providers' evaluations of him; she explained that she wanted to ensure that she would not be influenced by others' impressions of defendant. According to Dr. Holt, although defendant was "very cooperative" at Choate and had long stretches of time when he did very well, he had some violent episodes.

¶ 10    Jasmon was called as a defense witness. By agreement of the parties, he was not subjected to direct examination. The parties instead stipulated to his expertise and that he would testify consistently with the reports that he wrote before Dr. Holt evaluated defendant. On cross-examination, despite having authored reports indicating that defendant was not likely to be restored to fitness, Jasmon said that he had no opinion as to whether defendant was presently fit to stand trial.

¶ 11    Defendant was the final witness at the restoration hearing. The attorneys questioned him about his understanding of his charges, the potential penalties that he faced, and the roles of counsel and the judge. Some of defendant's answers suggested that he did not fully understand the court

process.  For example, he inaccurately believed, based on something that a staff member at Choate supposedly told him, that some of his charges had been dropped because he already "did the time for it."

¶ 12    The court determined that the State failed to prove that defendant had been restored to fitness.  The court found that Dr. Holt "primarily offered conclusions and unsupported opinions as the factors underlying her opinions."  To that end, she "offered very little concrete factual information to demonstrate the defendant's fitness."  The court noted that, prior to defendant meeting Dr. Holt, Jasmon consistently determined that defendant was unlikely to be restored to fitness.  In the court's view, Dr. Holt did not explain the "abrupt change" that led her to believe that defendant was fit.  Furthermore, although Dr. Holt believed that it was key to defendant's fitness that he was able to comport himself while housed at Choate, the court recalled evidence that "defendant was reported to be aggressive both physically and verbally and failed to cooperate on the unit 8 times in a 180 day period."  The court added:

> "Questions remain.  How did [defendant's] testing and function before and after Dr. Holt's arrival differ to support the change?  Was it incompetence, outdated testing procedures, lack of training, inexperience or improved forensic programs?  Dr. Holt's decision to not review or understand the previous determinations leaves the questions unanswered.
>
> The defendant's testimony did not illuminate any of these issues.  While on the stand the defendant seemed to understand some concepts but not others.  The defendant's testimony did not reveal his fitness to stand trial."

¶ 13    The court subsequently held a hearing pursuant to section 104-25(g)(2) of the Code (the "(g)(2) hearing") to determine whether defendant should be remanded to DHS for further treatment

on the basis that he "is subject to involuntary admission under the Mental Health and Developmental Disabilities Code or constitutes a serious threat to the public safety." 725 ILCS 5/104-25(g)(2) (West 2018). The (g)(2) hearing proceeded over the course of multiple dates between February and August 2019.

¶ 14     Dr. Holt was the only witness at the (g)(2) hearing. She testified that she evaluated defendant using the HCR-20, which is a tool for assessing one's risk of violence. She determined that defendant was "indicated" on 16 of the 20 factors. Her conclusions regarding some of those factors stemmed from defendant's history of responding to frustrating situations by becoming physically aggressive. Specifically, Dr. Holt learned of seven separate incidents that occurred in 2018 while defendant was housed at Choate. Those incidents included: (1) punching somebody (presumably another patient) in the eye who called him a derogatory name, (2) knocking papers out of the hands of a staff member and then striking her in the jaw (defendant was charged with aggravated battery in connection with this incident and was found not guilty by reason of insanity), (3) hitting a peer in the face after that peer teased him, (4) pulling the hair of a female staff member, (5) throwing a container of disinfectant wipes at a staff member and hitting that person on the side of the head, (6) getting in a fight with a peer, which resulted in the peer getting stitches, and (7) getting ready to fight a peer before staff intervened. As part of defendant's history of aggression, Dr. Holt also mentioned the charges that defendant faced in the case at bar.

¶ 15     According to Dr. Holt, defendant's other risk factors included that (1) he lacked a stable relationship with his father, (2) he lacked stable employment, (3) he reported an extensive history of substance abuse, (4) he had an intellectual disability, (5) he exhibited "characteristics consistent with antisocial personality disorder," (6) he had two indications of trauma (disruption in early parental relations and academic failure), (7) he lacked insight regarding both his need for treatment

and the problematic nature of his physical aggression, and (8) he lacked the ability to live independently. Dr. Holt acknowledged, however, that defendant did not have a childhood history of severe physical aggression or antisocial traits.

¶ 16    Dr. Holt explained that defendant's pattern of aggression and instability due to impulsivity weighed more heavily in her analysis than other factors covered by the HCR-20. According to Dr. Holt, although defendant went through periods when he complied with the rules at Choate and did not have violent outbursts, such outbursts would come about very quickly. Dr. Holt believed that, if defendant were released, he would require around-the-clock external support, like that which he was receiving at Choate, to manage life's frustrations and to avoid causing harm to himself or others.

¶ 17    Dr. Holt ultimately opined that defendant was "a threat to public safety" and "in need of mental health treatment on an inpatient basis for the safety of himself and others." She considered him to be a high risk in that regard.

¶ 18    During her cross-examination, Dr. Holt routinely volunteered more and/or different information than what the question required, and the court directed her multiple times to answer only the question that was asked. One area that defense counsel highlighted through cross-examination was that Dr. Holt did not document in her report each step that she performed during her analysis. For example, although the authors of the HCR-20 contemplated that an evaluator would rate each risk factor that was present as either low, medium, or high—and Dr. Holt claimed to have done so during her assessment of defendant—Dr. Holt did not specifically include that information in her report. Along the same lines, Dr. Holt acknowledged that some of the defendant's risk factors were only "partially present," although she could not recall which factors those were. Defense counsel also brought out that Dr. Holt did not use the rating sheet that was

supplied by the authors of the HCR-20. Instead, in her report, Dr. Holt took the liberty of renumbering and renaming some of the factors, purportedly for the convenience of the reader. Furthermore, Dr. Holt acknowledged that she limited her evaluation to a review of defendant's records, even though the authors of the HCR-20 envisioned that other sources, such as interviews, would be used as well. She deemed it unnecessary to conduct interviews, as the pertinent information was reflected in defendant's records.

¶ 19    On cross-examination, Dr. Holt further testified that she never assessed defendant for involuntary admission under the Mental Health and Developmental Disabilities Code. Moreover, she indicated that her understanding was that, prior to his arrest in connection with this case, defendant lived with his mother his entire life (33 years) and was never arrested. Dr. Holt clarified that, when she opined that defendant was a serious risk of harm to himself, she meant not that he was suicidal but that he would harm himself in a broader sense by hurting other people through his physical aggression.

¶ 20    The court issued a written decision on August 14, 2019. The court found "Dr. Holt's procedures, testimony and opinion to be credible and solidly based on objective criteria." The court also found that Dr. Holt's opinion was "corroborated by objective facts obtained from the current and past information about the Defendant." Accordingly, the court determined that defendant was "subject to involuntary admission under the Mental Health and Developmental Disabilities Code and a serious threat to public safety."

¶ 21    The court held further proceedings to identify the maximum term of defendant's commitment. On August 28, 2019, the court determined that defendant's maximum term of commitment was until February 19, 2090.

¶ 22    Defendant timely appealed.

¶ 23                                    II. ANALYSIS

¶ 24    Defendant challenges the sufficiency of the evidence supporting his commitment.    The

State responds that the evidence was sufficient to support the judgment.

¶ 25    Pursuant to section 104-25(g)(2) of the Code, when a defendant remains unfit for trial at

the conclusion of the extended period of treatment that is authorized by section 104-25(d), the

court must determine whether the defendant is "subject to involuntary admission under the Mental

Health and Developmental Disabilities Code or constitutes a serious threat to the public safety."

725 ILCS 5/104-25(g)(2) (West 2018).  This language is in the disjunctive, so a court may commit

a person, like defendant, who is not mentally ill if he constitutes a serious threat to the public

safety.  See *People v. Young*, 287 Ill. App. 3d 394, 398 (1997).  The State must prove by clear and

convincing evidence that the defendant meets the statutory criteria for commitment.  *People v.*

*Taylor*, 2013 IL App (3d) 110876, ¶ 12.  We must uphold the judgment unless it was against the

manifest weight of the evidence.  See *People v. Bocik*, 211 Ill. App. 3d 801, 807 (1991) (applying

the manifest-weight-of-the-evidence standard of review).

¶ 26    As a preliminary matter, the parties disagree as to whether the evidence before the court

during the (g)(2) hearing included the testimony that the victim provided at defendant's discharge

hearing.  On the first day of the (g)(2) hearing, during the prosecutor's direct examination of Dr.

Holt, defense counsel objected to a question.  In the course of responding to that objection, the

prosecutor asked the court to take judicial notice of "everything that the Court has heard in this

case, including the Court's finding of not not guilty at [the discharge hearing], and including the

testimony from the [restoration hearing]."  The court overruled defendant's objection without

specifically ruling on the prosecutor's request for judicial notice.  Later that day, the court returned

to this issue and appeared to take judicial notice only of the evidence that was presented at the

restoration hearing. Months later, in its order committing defendant pursuant to section 104-25(g)(2) of the Code, the court mentioned that it considered Dr. Holt's testimony from the restoration hearing; the court did not indicate that it considered the victim's testimony from the discharge hearing. Under these circumstances, in reviewing the court's judgment following the (g)(2) hearing, we feel constrained not to consider the victim's testimony at the discharge hearing.

¶ 27    We hold, however, that the evidence supported the trial court's finding that defendant constituted a serious threat to the public safety. Dr. Holt testified at length regarding the bases for her opinion to that effect, and there was no competing expert testimony on that issue. Defense counsel attempted to discredit Dr. Holt's methods and reasoning, and defendant reiterates those points thoroughly on appeal. Dr. Holt, however, was adamant that she assessed defendant properly. She detailed the facts that supported her conclusion with respect to each factor, and she explained which factors she deemed most significant. The trial court ultimately determined that Dr. Holt's procedures, testimony, and opinion were credible. The trial court was in the best position to assess Dr. Holt's credibility and to consider any flaws or discrepancies in her testimony. See *People v. Lang*, 113 Ill. 2d 407, 462 (1986) ("The circuit court, as the trier of fact, was in the best position to observe the conduct of the witnesses while testifying, to determine their credibility, and to weigh the evidence.").

¶ 28    Defendant asserts that Dr. Holt's testimony was "confusing and contradictory" and that her demeanor demonstrated "bias and a lack of respect for the Court and the process." Dr. Holt sparred with defense counsel to some extent during her cross-examination and provided lengthy responses to direct questions that required direct answers. We do not agree, however, that Dr. Holt exhibited bias or that she disrespected the court or the legal process.

¶ 29   Defendant emphasizes that Dr. Holt's testimony about his aggressive behavior while housed at Choate constituted hearsay by unnamed declarants. Although defendant acknowledges that such evidence was admissible, he argues that the trial court should not have deemed it reliable. We find no error. Our supreme court has recognized that " 'a patient's psychiatric history is one of the most important criteria in making a diagnosis.' " *Lang*, 113 Ill. 2d at 467 (quoting *People v. Anderson*, 113 Ill. 2d 1, 8 (1986)). To that end, "[a]ny psychiatric history would be incomplete and unreliable if it did not include the observations of nurses, social workers, and other personnel at the hospital where a patient has received psychiatric treatment." *Lang*, 113 Ill. 2d at 467. Treatment records are reliable, so it is proper for "doctors to disclose the information contained in the reports for the limited purpose of explaining their opinions." *Lang*, 113 Ill. 2d at 467; see also *In re Houlihan*, 231 Ill. App. 3d 677, 683-84 (1992) (rejecting an argument that the trial court could not give weight to the testimony of a psychiatrist regarding the instances of violence that were reflected in the respondent's medical records).

¶ 30   *In re Cutsinger*, 186 Ill. App. 3d 219 (1989), which defendant cites, is distinguishable. In *Cutsinger*, a psychiatrist testified that the respondent was "reasonably expected to inflict serious physical harm upon another in the near future." *Cutsinger*, 186 Ill. App. 3d at 224. The doctor based his opinion on reports that the respondent was " 'alleged to have become violent and threatening toward the staff,' " that he swung his fists at the staff, and that he threatened to " 'beat up residents.' " *Cutsinger*, 186 Ill. App. 3d at 224. However, the staff members who witnessed the events in question testified that the defendant was verbally abusive but not physically violent. *Cutsinger*, 186 Ill. App. 3d at 225-26. Under those circumstances, we reversed the respondent's commitment order, reasoning that the psychiatrist's testimony did not amount to clear and convincing evidence justifying involuntary commitment. *Cutsinger*, 186 Ill. App. 3d at 226-27.

Here, by contrast, Dr. Holt related numerous instances of defendant becoming violent while housed at Choate, and there was no evidence suggesting that these facts were untrue. See *Houlihan*, 231 Ill. App. 3d at 684 (distinguishing *Cutsinger* on the basis that Mr. Cutsinger did not commit acts that "could be reasonably intended to cause harm to other persons or himself"). Moreover, unlike Mr. Cutsinger, defendant was charged with multiple crimes involving violence. See *People v. Rasgaitis*, 222 Ill. App. 3d 855, 859 (1991) (distinguishing *Cutsinger* on the basis that Mr. Cutsinger was not charged with a violent crime).

¶ 31 Defendant further asserts that some cases upholding commitment orders involved "evidence of conduct and risk much more serious than any aggressive or threatening conduct that was proven in the case at bar." Comparing facts in this manner is not how we review sufficiency-of-the-evidence challenges. In cases involving involuntary commitment, "[t]he trial court's decision is given great deference, and absent a showing that it is against the manifest weight of the evidence, it 'will not be set aside at the appellate level, even if the reviewing court, after applying the clear[-]and[-]convincing standard, would have ruled differently.' " *In re Shirley M.*, 368 Ill. App. 3d 1187, 1194 (2006) (quoting *In re Bennett*, 251 Ill. App. 3d 887, 888 (1993)). Here, the trial court reasonably determined that the State presented clear and convincing evidence justifying defendant's commitment pursuant to section 104-25(g)(2) of the Code.

¶ 32                                    III. CONCLUSION

¶ 33 For the reasons stated, we affirm the judgment of the circuit court of Kane County.

¶ 34 Affirmed.